ABRAHAM GOODE *v.* STATE OF MARYLAND

[No. 616, September Term, 1978.]

\* \* \*

DAVID JEROME WALKER *v.* STATE OF MARYLAND

[No. 617, September Term, 1978.]

*Decided March 8, 1979.*

The cause was argued before GILBERT, C. J., and MORTON and MELVIN, JJ.

*Patricia A. Logan, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Richard*

624

*Berger, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Part of the majesty of American law is the power conferred upon the courts to strike down statutes which run afoul of the Constitution of the United States. No act of Congress or the Legislature may authorize a violation of the Constitution. *United States v. Brignoni-Ponce,* 422 U. S. 873, 95 S. Ct. 2574, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States,* 413 U. S. 266, 93 S. Ct. 2535, 37 L.Ed.2d 596 (1973). When the constitutional defect is brought to the attention of the court, the court is bound by its oath of office to excise the flaw. This is true whether there be a congenital defect in the statute or one that has come about through improper usage.

We herein declare that Maryland Transportation Code Ann. §§ 13-409 and 16-112 are facially constitutional but, in the circumstances of the instant case, were unconstitutionally applied.

The facts giving rise to the matter *sub judice* are uncomplicated. The appellants, Abraham Goode and David Jerome Walker, were convicted by a jury in the Criminal Court of Baltimore of three (3) handgun violations. The events leading to the convictions began at approximately 11:10 p.m. on September 20, 1977, when Sergeant William McLean of the Baltimore City Police Department observed the 1975 Ford Granada in which appellants were passengers parked in front of an abandoned school. McLean saw several people get in and out of the car. At that time McLean was "on random patrol." The sergeant described the area in which he saw the Granada as "an isolated area," and "it's unusual to see a car parked at that particular location at that time of night." He stopped the police cruiser in a position where he "kept the ... [Granada] under observation." McLean went on to relate that "[a]pproximately two to three minutes after ... [he] parked, ... [he] saw the car pull away and it went northbound on Carey Street, made a left turn heading westbound on Gold Street." The operator of the Granada did not violate any

traffic laws. Nevertheless, Sgt. McLean radioed that he was following a "suspicious vehicle" and that he "was going to pull the vehicle over." He requested a "backup unit." The sergeant then activated his "blue light and spotlight." McLean and an officer from the "backup unit" approached the halted Granada. The operator,[1] who was not one of the appellants, "could not produce either a driver's license or a registration for the vehicle." An attempt to verify that the operator was licensed fell short inasmuch as the "D.M.V. computer was out of service." The fact that the computer was not working also prevented the police from ascertaining to whom the Granada belonged. All the occupants of the vehicle were "asked"[2] to get out of the car. They complied. A "Mr. Parnell,"[3] had his "hands in front of his sweat shirt. He had a hooded sweat shirt on. It had one of those sewn pockets across the front." Parnell was told "to remove his hands, and it looked like something was coming out of the pocket with it." The "something" turned out to be a wallet which "fell open." McLean said, "From the wallet fell a glassine bag containing a white powder, same type of glassine bag that narcotics are normally packaged in. . . . At this time Mr. Parnell was informed that he was under arrest for possession of . . . controlled dangerous substance." McLean then returned to the vehicle and "shined the light to the floor directly in front of the passenger compartment." He observed "what appeared to be the stock of a gun." McLean withdrew the gun, a sawed-off shotgun, and in so doing discovered a .22 caliber automatic as well as a .32 caliber revolver. The

---

1. The operator was later identified to be Lawrence Terry Monroe. He was jointly charged and tried with the appellants, but he was acquitted by the jury.

2. Whether the Maryland Constitution permits police to "order" passengers to alight from a motor vehicle is a question which is not presently before us. Nonetheless, we note in passing that the Louisiana Supreme Court recently concluded that the rationale of Pennsylvania v. Mimms, 434 U. S. 106, 54 L.Ed.2d 331, 98 S. Ct. 330 (1977), does not extend to automobile passengers. Acknowledging that the *Mimms* decision permits police routinely to order drivers out of their vehicles when they are stopped for traffic offenses, the Louisiana Supreme Court, nevertheless, determined that "[t]here is no legitimate support in Louisiana for a rule that would permit police to remove a passenger from an automobile on a routine traffic stop." State v. Williams, (La. Sup. Ct. 12/15/78), 24 Cr.L. 2359, 2360 (1979).

3. Parnell was not tried with the appellants.

shotgun was unloaded, but the other two weapons contained ammunition.

At a hearing on the appellants' motion to suppress, the appellants asserted that their arrest was illegal,[4] and that any evidence seized thereafter was tainted. The hearing judge implicitly found that Sgt. McLean had the authority to stop the Granada and to request the operator to produce for examination a driver's license and registration card. From that premise, the court went on to conclude that when the operator of the vehicle could not produce the requested documents, the police were within their right to order the occupants from the car, and that "bearing in mind the activity of the Defendants as one little bit of probable cause piled on another little bit . . . the officers were obligated at that time to further search the car to see if any controlled dangerous substance or any weapons were in it." The motion to suppress was denied, and the case proceeded to trial by a jury with the result we have previously stated.

Inasmuch as the operator of the vehicle in which the appellants were passengers was not ostensibly in violation of any law at the time the car was halted by Sgt. McLean, the justification, if any, for the stopping of the automobile must be found within the Maryland Transportation Article. That article of our code contains two separate provisions which permit police to demand production for examination of a driver's license or the registration card.

Transportation Art. § 13-409 provides:

> "(a) *In general* — At all times, each registration card shall be carried:
> (1) In the vehicle to which it refers; or
> (2) By the individual driving or in control of the vehicle, who shall display it, on demand, to *any police officer who identifies himself as such.*" (Emphasis supplied.)

---

4. We are unable to find within the record a motion to suppress filed by or on behalf of appellant Walker. Nevertheless, the docket entries reveal that the judge "heard and denied" Walker's "Motion to Suppress." We infer that such a motion was filed.

Section 16-112 of the same article provides in pertinent part:

"(a) *Possession and display of license; writing sample.* —
(1) In this subsection, 'display' means the manual surrender of the licensee's license into the hands of the demanding officer for inspection.
(2) Each individual driving a motor vehicle on any highway in this State shall:
(i) Have his license with him;
(ii) Display the license to any *uniformed* police officer who demands it . . . ." (Emphasis supplied.)

As the Revisor's Note points out, the above two sections of the Transportation Article are incongruous and might cause more problems than they solve. As now written, the statutes confer upon a uniformed police officer the authority, under proper circumstances, to demand and receive for examination the operator's driver's license and registration card. If, however, the law officer is not in uniform, he is entitled to receive and examine the registration card when he identifies himself as an officer of the law, but he is not entitled to view the driver's license. One would expect that the refusal of the operator to show his driver's license to a non-uniformed law officer probably would produce a confrontation between the officer and the motorist that is fraught with peril to both. Such a confrontation could be avoided by a change in the statute so as to bring it in line with section 16-112.

We observe that prior to Laws 1970, ch. 534, the Motor Vehicle Code, then Article 66½, provided that a registration card was to be exhibited "upon demand of any uniformed officer of the law." Laws 1943, ch. 1007, § 26; Md. Ann. Code (1951) Art. 66½, § 29. A return by the legislature to that particular phraseology could eliminate possible misunderstanding between the police and the motoring public.

Nevertheless, neither Transportation Art. § 13-409 nor § 16-112 nor their predecessors may be read as sanctioning

a random stopping of a single vehicle by police for a "routine check" if the stop is arbitrary, gratuitous, and without justification in the form of reasonable suspicion to believe that a specific violation of the motor vehicle code or some other offense has occurred, because such a stop would be violative of the motorist's constitutional rights.[5] We further overrule any of our prior decisions to the extent that they may indicate a sanctioning of the single stop.[6]

The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, *see Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961); *Robinson v. State,* 18 Md. App. 678, 308 A. 2d 734 (1973), *cert. denied,* 269 Md. 765 (1973), provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be. violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Supreme Court of the United States said in *Terry v. Ohio,* 392 U. S. 1, 16, 88 S. Ct. 1868, 1877, 20 L.Ed.2d 889, 903 (1968) that:

"It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime — 'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."

---

5. In holding that the selective stopping of a single motor vehicle is unconstitutional, we do not imply that the nondiscriminatory stopping of vehicles at a roadblock is prohibited. Where every motorist who passes a given location is stopped, that detention has been sanctioned. Brignoni-Ponce, *supra;* Almeida-Sanchez, *supra. See The Automobile Spot Checks and the Fourth Amendment,* 6 Rut.-Cam. L.J. 85 (1974-75).

6. Among those decisions are Kraft v. State, 18 Md. App. 169, 305 A. 2d 489 (1973); Glover v. State, 14 Md. App. 454, 287 A. 2d 333 (1972); and Burkett v. State, 5 Md. App. 211, 245 A. 2d 911 (1968).

*See also United States v. Brignoni-Ponce, supra.*

The United States Court of Appeals for the Ninth Circuit, in *United States v. Mallides,* 473 F. 2d 859, 861 (9th Cir. 1973), held that "[a] person whose vehicle is stopped by police and whose freedom to drive away is restrained is as effectively 'seized' as is the pedestrian who is detained." Similar holdings are found in state court decisions.[7] *See, e.g., State v. Ochoa,* 112 Ariz. 582, 544 P. 2d 1097 (1976); *People v. James,* 44 Ill. App. 3d 300, 3 Ill. Dec. 88, 358 N.E.2d 88 (1976); *State v. McKinley,* 305 Minn. 297, 232 N.W.2d 906 (1975); *Morgan v. Town of Heidelberg,* 246 Miss. 481, 150 So. 2d 512 (1963); *People v. Ingle,* 36 N.Y.2d 413, 330 N.E.2d 39 (1975); and *Commonwealth v. Swanger,* 453 Pa. 107, 307 A. 2d 875 (1973).

In *Terry v. Ohio,* 392 U. S. at 20-21, 20 L.Ed.2d at 905, 88 S. Ct. at 1879, the Supreme Court, quoting from its earlier decision in *Camara v. Municipal Court,* 387 U. S. 523, 534-35, 536-37, 18 L.Ed.2d 930, 938-40, 87 S. Ct. 1727, 1734-35 (1967), asserted that:

> "[I]t is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' "

The cited cases permit a forcible stop of a motorist, however, when the police officer is able to point to specific and articulable facts, which, together with the rational inferences properly drawn therefrom, warrant a reasonable suspicion that a crime is being committed, is about to be

---

7. *See also* State v. Mayo, Daily Record, August 16, 1978, a *nisi prius* case in which Judge Robert I. H. Hammerman, in a thoughtful analysis of the statutes in question, struck down the so-called "Battaglia plan" (named after now Deputy Chief Frank Battaglia, the father of the plan), a system of random "spot checks" of motorists in Baltimore City. While we agree with the result reached by Judge Hammerman, we do not conclude that Transportation Art. §§ 13-409 and 16-112 are unconstitutional. Neither section, in our view, contravenes the Fourth Amendment. Rather, it is the use being made of the sections that is violative of the Constitution.

committed, or has been committed. *People v. James,* 44 Ill. App. 3d at 303, 358 N.E.2d at 91. If the courts were to take a contrary view, they would in effect be clothing the police with "absolute discretion to intrude into the lives of the occupants of motor vehicles," thereby effectively precluding judicial review of the exercise of the discretion. *Id.* The police would then be at liberty to stop without rhyme or reason any motorist, at any time, on any whim, merely on the outside chance that the operator of the vehicle would be unlicensed, not in possession of his license, not have a registration card in his possession, or be driving a stolen vehicle. Such a stop is a "fishing expedition" that we will not license. Were we to do so, we would be abdicating the court's role of buffer between the police and the citizenry.

We recognize that the State has a valid and vital interest in highway safety, and that normally the operation of vehicles by nonlicensed drivers or those operating without a registration card are not readily detectable by mere observation of the manner in which the vehicle is driven. The number of deaths annually attributed to motor vehicle collisions is awesome, without even considering the loss occasioned by bodily injury and property damage arising from those vehicular accidents. Certainly, the State has a duty to protect its citizens through highway safety. Yet, the motorist also has the right to be protected from arbitrary intrusion by the State into his freedom of locomotion. *People v. Ingle, supra; see generally, The Right to Travel: In Search of a Constitutional Source,* 55 Neb. L. Rev. 117 (1975-76). The question then becomes one of balancing the State's interest in the welfare of its people against that of the individual motorist. While we conclude that, in the light of the Fourth Amendment, the scale tips in favor of the individual vis-à-vis the State, the latter is not without adequate means of protecting the public's interest through highway safety. This is true because the factual basis necessary to underpin the stop of a motorist for a spot or routine check, is minimal indeed. *Commonwealth v. Swanger,* 453 Pa. at 112, 307 A. 2d at 878. An actual violation of the motor vehicle sections of the

Transportation Article need not be detected.[8] "All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity." *State v. McKinley,* 305 Minn. at 304, 232 N.W.2d at 911. Moreover, it may not be simply because of the motorist's national origin, race, or sex. "It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' (*Terry v. Ohio,* 392 U. S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889, *supra*)." *State v. McKinley,* 305 Minn. at 304, 232 N.W.2d at 911.

Sgt. McLean, in the case at Bar, did not articulate any specific facts that warranted the intrusion into the motorist's right to be secure in the automobile he was driving, nor are there any rational inferences properly deducted from the facts, which, when added to Sgt. McLean's testimony, will pass muster so as to permit trespass upon the Fourth Amendment protection afforded the motorist. In sum, all that the State produced in the way of justification for the stop of the vehicle in which appellants were riding was the suspicion that was aroused within the sergeant's mind, and that suspicion falls well short of "articulable specific facts."

Inasmuch as there was no lawful basis for the halting of the vehicle in the instant case, the stop was illegal, and all that flowed therefrom, including the recovery of the guns, was an unconstitutional seizure. The appellants' motions to suppress the guns should have been granted. We shall reverse without remanding for a new trial because the evidence must be suppressed, and without that evidence, there is no case. *Compare State v. Boone,* 284 Md. 1, 393 A. 2d 1361 (1978).

*Judgments reversed.*
*Costs to be paid by Mayor and City*
*Council of Baltimore.*

---

8. *See e.g.,* Transportation Art. § 23-105 which pertains to police authority to issue an equipment order directing the owner of the motor vehicle to make or cause to be made certain repairs to the motor vehicle.