584 A.2d 1266

**STATE of Maryland**

v.

**Thomas E. OTT, III.**

**No. 1218, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 29, 1991.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Lawrence A. Dorsey, Jr., State's Atty. for Frederick County of Frederick, on brief), for appellant.

José Felipé Anderson, Asst. Public Defender (Stephen E. Harris, Public Defender and Victoria S. Keating, Asst. Public Defender, on brief), Baltimore, for appellee.

Argued before GARRITY, ALPERT and FISCHER, JJ.

ALPERT, Judge.

In this case, the State charged Thomas E. Ott, III (appellee) with possession of a controlled dangerous substance, possession of a controlled dangerous substance with intent to distribute, and possession of drug paraphernalia. After a hearing on Ott's motion to suppress the evidence, the Circuit Court for Frederick County granted the motion and the State (appellant) appeals to us from that ruling.

## FACTS

Corporal James Fogle of the Frederick County Sheriff's Office was the sole witness who testified at the suppression hearing. His testimony established the following facts:

On January 5, 1990, Corporal Fogle was on routine patrol near the Francis Scott Key Mall in Frederick, Maryland. At about 1:40 a.m., he observed two people sitting in a car in an otherwise deserted public parking lot in that mall. No signs were posted that said "No trespassing," nor were there any indicating that parking was prohibited after certain hours. In short, no restrictions had been posted at all. Fogle stopped to check the car and its occupants because of thefts and acts of vandalism that previously had occurred in the parking lot. When he decided to do so, he saw nothing suspicious occurring in the car or anywhere else nearby.

Fogle asked the two individuals their names and also asked what they were doing there. They identified themselves as Thomas Ott (seated in the driver's seat) and Sandra Sorenson (seated in the passenger's seat), and said that they were just talking. After Fogle obtained identification from each one, he radioed police headquarters to run a computer check to determine whether either of them was the subject of an outstanding warrant. Nothing in Fogle's testimony suggested that Ott's or Sorenson's responses to his initial questions were suspicious in any manner; likewise, Fogle appears to have requested written identification to run a computer check as a matter of routine.

The computer check indicated that an outstanding warrant existed for Ott because of his failure to appear in a civil "non-payment" case. Fogle subsequently arrested Ott on this basis. Fogle then asked Sorenson—the car owner—to step out of the car so that the other officers on the scene could conduct a search incident to Ott's arrest. As Sorenson exited the car, Corporal Johnson spied a twenty-dollar bill rolled up into a straw that fell from her lap. Fogle confiscated the bill as evidence, recognizing that it could be used to ingest controlled dangerous substances. The officers proceeded to search the car. They discovered in the glove compartment three bags of a white powdery substance that Fogle recognized to be cocaine. In addition, they found under the passenger seat a small round mirror with a white powdery residue on it. The officers handcuffed Ott and Sorenson, and transported them both to the police station. After Ott signed a waiver of rights form, he told Corporal Smith that he was trying to sell the cocaine to get out of debt.

Corporal Fogle later determined that, in fact, no outstanding warrant existed for Ott because the bench warrant had been satisfied on December 29, 1989. Another sheriff apparently had served the warrant, but had not removed it from the computer before January 5, 1990. At the suppression hearing, the State introduced a computer printout which showed that there was an active warrant when Corporal Fogle ran the computer search.

The State rested at the conclusion of Corporal Fogle's testimony; defense counsel announced that he would not present any evidence, only argument. At that point, the State argued that Ott did not have standing to object to the vehicle search because Sorenson owned the car. Defense counsel countered that Ott indeed had standing because he had been sitting in the driver's seat. Defense counsel also argued that the court should suppress the evidence because no outstanding warrant existed when Fogle arrested Ott on January 5, 1990.

The trial court held that Ott had standing by virtue of "his sitting in the passenger seat of the vehicle at the time that the officers came up." The court further held that the officers had no probable cause "in the first place to go in like they did." Finally, the court held that the officers could not search the glove compartment incident to Ott's arrest "[b]ecause the weapons would certainly be outside the reach of Mr. Ott who was already handcuffed according to the officers." For these reasons, the court granted Ott's motion to suppress the evidence. On appeal, the State asks us to decide whether the trial court erred when it suppressed the evidence that the officers seized incident to Ott's arrest.

### The Search and Seizure

The State contends that the trial court erred when it granted Ott's motion to suppress the evidence. It argues that we should reverse the trial court's decision for any one of the following three reasons: (1) Ott lacked standing to challenge the lawfulness of the vehicle search, (2) Ott's arrest was legal and the search therefore was a valid search incident to a lawful arrest, and (3) even if the arrest technically was improper because no outstanding warrant existed when Corporal Fogle arrested Ott, the officer acted in good faith so the exclusionary rule should not apply.

Because we shall hold that there was no Fourth Amendment violation, we assume arguendo that Ott had standing to challenge the lawfulness of the vehicle search and therefore need not address that issue.

### A. Initial Encounter

1. Police–Citizen Encounter

■ The State argues that neither probable cause nor articulable suspicion was required for Corporal Fogle to approach the car and to question the occupants. We agree.

Not every encounter between police officers and citizens engages the protections of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20

L.Ed.2d 889 (1968). These protections would apply only if a police officer "seized" a citizen during the course of such an encounter. *See* 3 *W. LaFave Search and Seizure* § 9.2(h), at 402 (1987) [hereinafter *W. LaFave*]. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [1] *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980);

---

1. In 3 W. LaFave, *Search and Seizure* § 9.2(h), at 410–418 (1987) [hereinafter *W. LaFave*], LaFave notes that if the "freedom to walk away" test under *Mendenhall* and *Royer* is interpreted literally, then almost all encounters between police officers and citizens would be considered Fourth Amendment seizures because the average person would feel compelled to stop and respond. *Id.* at 410. Instead, LaFave proposes a reinterpretation of the "freedom to walk away" test

> which is grounded in the proposition that police, without having later to justify their conduct by articulating a certain degree of suspicion, should be allowed 'to seek cooperation, even where this may involve inconvenience or embarrassment for the citizen, and even though many citizens will defer to this authority of the police because they believe—in some vague way—that they should.' That is, if 'the moral and instinctive pressures to cooperate are in general sound and may be relied on by the police,' then a street encounter does not amount to a fourth amendment seizure merely because of those pressures—that is, merely because the other party to the encounter is known to be a policeman. Rather, the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse. The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens.

*Id.* at 410–11 (citations omitted).

LaFave finds this approach useful in cases in which a police officer interacts with an individual seated in a parked car. *Id.* at 415. Thus, there is no seizure when an officer approaches and questions such persons, uses a generally accepted means such as tapping on the window to get the person's attention, opens the door if the person is asleep, or even requests that the person roll down the window or open the door. *Id.* at 415–16 (citations omitted). At the same time, an order to roll down the window or open the door or for the individual to get out of the car can turn the encounter into a seizure for Fourth Amendment purposes. *Id.* at 416.

LaFave points out that this general approach also explains "why vehicle stops are generally viewed as seizures while pedestrian encounters typically are not...." *Id.* at 417.

see also *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). More than mere questioning by a police officer is required to make a reasonable person believe that he or she is not free to leave, and a number of courts have held that no seizure occurred when a police officer approached a parked car to ask the occupants a few questions. *See* 3 *W. LaFave, supra,* § 9.2(h), at 408–09 & n. 230 (1987 & Supp.1991).

In this case, Corporal Fogle approached the parked car and asked the two occupants who they were and what they were doing. They identified themselves and said that they were "just talking." In our view, this exchange did not constitute a seizure within the meaning of the Fourth Amendment. We think that a reasonable person under these circumstances would have believed that he or she was "free to leave." That is, Officer Fogle did nothing to add to the "moral and instinctive pressures to cooperate" that Ott and Sorenson might have felt by "engaging in conduct significantly beyond that accepted in social intercourse."[2] *See* 3 *W. LaFave, supra,* § 9.2(h), at 412; *see also supra* note 1.

### 2. Identification Request

■ We further hold that the officer's subsequent re-

---

**2.** There was no evidence in the record to suggest that the officer exerted even subtle pressure on Ott to remain there and to cooperate with the officer's requests. Further, the State at oral argument acknowledged that Ott could have left at any time had he chosen to do so.

Ott, however, argued in his brief that when the police officer asked him for identification to run a computer check, Ott could not reasonably have believed that he was free to refuse the request or to leave. In our discussion, *infra,* we find that sections 13–409 and 16–112 of the Transportation Code authorize police officers to request an individual's driver's license and/or vehicle registration card. *See infra* text pp. 639–643 and notes 4 & 5. In *Beckwith v. State,* 78 Md.App. 358, 362, 553 A.2d 259 (1989), *rev'd on other grounds,* 320 Md. 410, 578 A.2d 220 (1990), we agreed that under the circumstances of that case, the officers had no right to *demand* to see the defendant's driver's license, but we distinguished between a "demand" and a "request." As in *Beckwith,* there was no evidence of a "demand" in this case.

quest for Ott's identification [3] to run a computer check was reasonable and did not turn the consensual encounter into a seizure under the Fourth Amendment. Maryland cases have interpreted sections 13–409 [4] and 16–112 [5] of the Transportation Code to authorize police officers to request an individual's driver's license and/or vehicle registration card. *See Byrd v. State,* 13 Md.App. 288, 292–93, 283 A.2d 9 (1971); *Taylor v. State,* 9 Md.App. 402, 405–06, 264 A.2d 870 (1970); *see also Beckwith v. State,* 78 Md.App. 358, 362 n. 4, 553 A.2d 259 (1989), *rev'd on other grounds,* 320 Md. 410, 578 A.2d 220 (1990).

---

3. The record is unclear as to whether the officer used Ott's verbal identification of himself or a document with identification to run the computer check:

> Q  Who did you identify them as being?
> A  The driver was Mr. Ott, seated with Mr. Stillrich.  And the passenger was a Sandra Sorenson.
> Q  Alright, did you ask them what they were doing in the parking lot?
> A  Yes I did.
> Q  And what was the response?
> A  They stated they were just talking.
> Q  Alright and what did you do then?
> A  I ran a computer check, I got identification from both and ran a computer check for wanted on both of them.

In his brief, Ott alleged that Officer Fogle violated Ott's freedom of movement when he "obliged [Ott] to hand over *written identification (presumably, his driver's license)* so that he could 'run a computer check for wanted' on him...." (emphasis added).

We think it is reasonable to assume for our purposes that Ott produced a document with identification and that it was a driver's license.  Because the police later determined that Sorenson owned the car, it is unlikely that Ott would have produced a vehicle registration card to identify himself.

4. Section 13–409(b) provides that "[o]n demand of a police officer who identifies himself as a police officer, an individual who is driving or in control of a vehicle shall display a registration card that refers to the vehicle."  Md.Transp.Code Ann. § 13–409(b) (1987).

5. Section 16–112(c) provides that "[e]ach individual driving a motor vehicle on any highway in this State shall display the license to any uniformed police officer who demands it."  Md.Transp.Code Ann. § 16–112(c) (1987).

The facts in the case *sub judice* are similar to those in *Taylor v. State*, 9 Md.App. 402, 264 A.2d 870 (1970). In *Taylor*, a police officer observed two young men sitting in a car, which was parked in front of a bar in a high crime area of the city at 12:15 a.m. *Id.* at 404, 264 A.2d 870. Knowing that " 'it's the younger generation generally observed stealing cars,' " the officer asked James Edward Taylor, who was seated in the driver's seat, for a driver's license and vehicle registration card. *Id.* The officer took these documents and called the police station to determine whether the vehicle was stolen and whether there were any warrants outstanding on Taylor. *Id.* There were, as it happened, and the officer arrested Taylor. *Id.* at 404–05, 264 A.2d 870. After the arrest, the officer observed two brown envelopes on the front seat. *Id.* at 405, 264 A.2d 870. He knew from experience that these often were used for narcotics. *Id.* Examination of these envelopes revealed a "large number of capsules and a leafy substance," later determined to be methadone and marijuana. *Id.* The trial court admitted the narcotics into evidence over Taylor's objections. *Id.* Taylor appealed from his conviction of unlawful possession of narcotics, contending—among other things—that the officer had no right to check his driver's license and vehicle registration: his car had been parked at the time and the officer had not observed any illegalities. *Id.* at 404–05, 264 A.2d 870. Taylor also contended that even if the officer had the authority to request the documents, he should not have detained Taylor after he had displayed them. *Id.*

In writing for the court, Judge Robert C. Murphy—then Chief Judge of the Court of Special Appeals and now Chief Judge of the Court of Appeals—pointed out that Article 66½, sections 97 and 31 [6] authorized uniformed officers to

---

6. The language of the statutes in effect when the court decided *Taylor* is different than that of the current statutes. *See supra* notes 4 & 5. At that time, Article 66½, section 97 provided that "[o]perating licenses shall at all times be carried by the licensee when operating a motor vehicle upon the highways of this State, and shall be subject to

request a driver's license and vehicle registration card respectively. *Id.* at 405–06, 264 A.2d 870. Judge Murphy further noted that "[t]he applicability of the statutes do [sic] not, however, depend upon whether the operator has committed some traffic or other violation of law, nor are they inapplicable simply because the vehicle is parked, rather than in actual operation." *Id.* at 406, 264 A.2d 870 (citations omitted).

The *Taylor* court held that the officer, who was in uniform, "had the right to ask [Taylor] for his driver's license and registration card," and that Taylor was not "seized" simply because the officer verified the documents by radioing police headquarters. *Id.* The court further held that probable cause to make the arrest arose once the officer learned of the outstanding warrant. *Id.*

In this case, we already have established that the officer's initial contact with Ott was not a seizure under the Fourth Amendment. Following our decision in *Taylor*, we hold that the officer's request for Ott's identification—presumably a driver's license—was authorized by section 16–112 of the Transportation Code and was not a seizure under the facts of this case.[7]

In so holding, we are not unmindful of our decision in *Goode v. State*, 41 Md.App. 623, 398 A.2d 801 (1979). In *Goode*, we held that the random stop of a single vehicle for a routine check under sections 16–112 and 13–409 of the

---

examination upon demand by an uniformed officer of the law...." Md.Ann.Code art. 66½, § 97 (1967).

Section 31 of that article stated that "[e]very such registration card shall be carried at all times in the vehicle to which it refers or shall be carried by the person driving or in control of such vehicle who shall display the same upon demand of any uniformed officer of the law." Md.Ann.Code art. 66½, § 31 (1967).

We think that the difference in the statutory language is minimal and makes no difference for our purposes in this case.

**7.** We want to make clear that the facts of this case are such that it falls short of a *Terry* stop as well and that we do not uphold the officer's actions on that basis. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Transportation Code constituted an unconstitutional seizure, *id.* at 628, 398 A.2d 801, unless there was some minimal factual basis ("articulable specific facts") to underpin the stop. *Id.* at 630–31, 398 A.2d 801. We also overruled "any of our prior decisions to the extent that they ... indicate[d] a sanctioning of the single stop." [8] *Id.* at 628, 398 A.2d 801. We think, however, that *Goode* and vehicle stop cases generally [9] are distinguishable from the instant case.

A random stop of a vehicle to check the driver's documents—such as that in *Goode*—visits a "physical and psychological intrusion" on the vehicle's occupants. *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979). These vehicle stops "generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority." *Id.* They interfere with "freedom of movement, are inconvenient, and consume time." *Id.* Further, they "may create substantial anxiety." *Id.*

Any intrusion visited upon the occupant of a parked vehicle—such as the one in this case—is minimal by comparison. Here, there was no "unsettling show of authority" by Corporal Fogle, either when he approached the car, asked questions of the occupants, or requested their identification. There was no interference with the occupants' freedom of movement because the vehicle already was parked. Fur-

---

8. Among the previous decisions that we overruled were *Kraft v. State*, 18 Md.App. 169, 305 A.2d 489 (1973); *Glover v. State*, 14 Md.App. 454, 287 A.2d 333 (1972); and *Burkett v. State*, 5 Md.App. 211, 245 A.2d 911 (1968). *See Goode v. State*, 41 Md.App. 623, 628 n. 6, 398 A.2d 801 (1979).

9. *But see United States v. Adegbite*, 846 F.2d 834, 838 (1988), in which the Second Circuit found that "where the car had barely started in a parking lot, moved only fifteen to twenty yards, and was moved to a halt by DEA agents on foot and in plain clothes," as being more analogous to the cases of pedestrians and parked cars to which the *Mendenhall* seizure test (the "freedom to walk away" test) is applied. (citations omitted.) *See supra* n. 1.

ther, the momentary inconvenience and brief time involved for the officer to verify that the parties were who they said they were do not seem unreasonable given the circumstances, *i.e.*, the car was the sole vehicle in a deserted parking lot at 1:40 a.m. and the officer was aware of previous acts of theft and vandalism that had occurred in the lot. We believe that there is a substantial difference between the random stop of a vehicle to run a "routine" check on a driver's license and vehicle registration card, and a request for identification to verify the same from the occupant of the vehicle parked in a deserted lot in a high crime area at 1:40 a.m. In short, the officer's request for Ott's identification was not a seizure under the Fourth Amendment.

### B. Arrest

Once police headquarters informed Corporal Fogle that an outstanding warrant existed for Ott, the officer then had probable cause to make the arrest. Our analysis does not end here, however, because the officer later learned that the warrant on which he relied to make the arrest had been served by the sheriff the previous week.

### 1. Good Faith Exception

■ The State contends that Ott's arrest was legal despite the fact that the warrant already had been served and the police had failed to remove it from their computer files. It argues that Corporal Fogle's good faith reliance on the warrant precludes the application of the exclusionary rule. Thus, we must decide whether the good faith exception to the exclusionary rule applies under the facts of this case.

The exclusionary rule is a " 'judicially created remedy' " designed to deter police misconduct. *United States v. Leon*, 468 U.S. 897, 906, 917, 104 S.Ct. 3405, 3411, 3417, 82 L.Ed.2d 677 (1984) (citation omitted). " 'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, *or at the very least negligent*, conduct which has deprived the defendant of some

right. [ ] If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, *or may properly be charged with knowledge,* that the search was unconstitutional under the Fourth Amendment.' " *Id.* at 919, 104 S.Ct. at 3418 (quoting *United States v. Peltier,* 422 U.S. 531, 539, 542, 95 S.Ct. 2313, 2318, 2320, 45 L.Ed.2d 374 (1975)) (emphasis added).

Courts that have addressed the problem of an arrest based on outdated police records focus upon whether the officers' good faith reliance on the inaccurate records provided probable cause for a valid arrest. In making that determination, these courts primarily have considered the amount of time that elapsed between the time that the warrant or stolen vehicle report became invalid and the time of the arrest. *See* Annotation, *Validity of Arrest Made in Reliance Upon Uncorrected or Outdated Warrant List or Similar Police Records,* 45 A.L.R. 4th, at 554 (1986).

In *Carter v. State,* 18 Md.App. 150, 305 A.2d 856 (1973), we said that probable cause for an arrest did not exist when the officer, in making the arrest, relied on an official police broadcast that was based on erroneous information—an outdated stolen vehicle report. The stolen vehicle report on which the officer relied became invalid on January 10, 1969. On March 10, 1969, the date of the arrest, the police still had not cancelled or rescinded the outdated report. Thus, the report was active for two months longer than it should have been.

We based our decision in *Carter* on the "collective knowledge" rule, *see Albo v. State,* 477 So.2d 1071, 1075 n. 4 (Fla.Dist.Ct.App.1985), that the Supreme Court established in *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971), *i.e.,* that an individual officer need not have personal knowledge of facts which show probable cause so long as other officers who directed the arrest have such personal knowledge. That rule works

both ways: "to validate an arrest when the responsible officers have probable cause and to vitiate it when . . . none objectively exists." [10]   *Albo,* 477 So.2d at 1073.   Consequently, we said in *Carter* that because "the information possessed by the police team was an outdated erroneous report of a stolen motor vehicle which the police had recovered on the same day it was taken, [t]he police team . . . must be charged with the knowledge that the report was, in effect, rescinded when [the police] . . . recovered the car shortly after it was stolen.   Accordingly, the erroneous information transmitted to [the officer] and on the basis of which he arrested the appellant was clearly insufficient to show probable cause."   *Id.* [18 Md.App.] at 156, 305 A.2d 856.

We think that the "collective knowledge/collective ignorance" rule, *see Albo,* 477 So.2d at 1075 n. 4, applies in this case as well.   We already have noted that it is the amount of time which elapses between the time that the warrant or stolen vehicle report becomes invalid and the time of the arrest which primarily determines whether probable cause

---

**10.**   The Court's decision in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), left the rule unaffected.

The exception to the exclusionary rule stated in *Leon* specifically applies to a case in which 'an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'   In that instance, the fact that the magistrate had *erroneously* found probable cause [did] not result in a suppression of evidence seized under the warrant.   The explicitly-stated basis for this holding was the determination that the interest in deterring unlawful police conduct, which is the foundation of the exclusionary rule, is not implicated in such a case.   This is because, on the one hand, the situation involves 'no police illegality and thus nothing to deter,' and, on the other, exclusion would have no 'significant deterrent effect on the issuing judge or magistrate' who made the underlying error.   Plainly, these considerations have no effect upon a case like *Pesci* [*v. State,* 420 So.2d 380 (Fla. 3d DCA 1982) ] or this one in which no judicial determination was involved and the arrest was based instead wholly upon erroneous information supplied by the law enforcement authorities themselves.

*Albo v. State,* 477 So.2d 1071, 1073 (1985) (citations omitted) (emphasis added).

exists for a valid arrest.[11]

In this case, the sheriff actually served the warrant on Ott on Friday, December 29, 1989. The warrant still appeared active in the computer files at the time of Ott's arrest at 1:40 a.m. on January 5, 1990. Corporal Fogle did not learn until that evening (January 5) that the sheriff had served the warrant the week before. In contrast to the stolen vehicle report in *Carter*, the warrant remained active for seven days beyond the time that the police should have removed it from the computer files. Two of those days, December 30 and 31, were a Saturday and a Sunday; a third day, January 1, was a holiday. We assume that Corporal Fogle learned on January 5 that the warrant no longer was active because someone entered the information into the computer on that day. Thus, the warrant remained in the computer a total of four days longer than it should have.

Based on the facts before us, we do not think that this is a case of police misconduct or negligence such that we should apply the exclusionary rule. Other courts have upheld arrests based on similar outdated information. These courts were "unwilling to invalidate the arrest simply because '[a]dministrative delays attendant to the operation of any metropolitan police department resulted in failure to remove satisfied warrants from the computer 'active' list before the officers received the radio dispatch ... that the warrants were outstanding.' " *Commonwealth v. Riley*, 284 Pa.Super. 280, 425 A.2d 813, 816 (1981) (quoting *Childress v. United States*, 381 A.2d 614 (D.C.App.1977)). We hold that the officer's good faith reliance on computerized information that was only four days out of date was sufficient to justify Ott's warrantless arrest. Thus, the warrantless search of the vehicle was valid as a search incident to a

---

11. The probable cause determination appears to be a legal fiction. The court, in effect, actually determines whether there was police misconduct—or at least negligence—that might be deterred in the future by the application of the exclusionary rule. 2 *W. LaFave* § 3.5(d), at 21–22.

lawful arrest, and the trial court erred when it granted Ott's motion to suppress the evidence.

### 2. Scope of Search Incident to an Arrest

■ In the suppression hearing, the court found that even if the officers had had a valid warrant, *i.e.*, probable cause for Ott's arrest, they exceeded the permissible scope of a search incident to a lawful arrest when they opened the glove compartment. The court reached this conclusion by reasoning that any weapons in the car would have been outside Ott's reach because the officer already had handcuffed him. In its brief, the State contends that "it was proper to search the glove compartment and interior of the car even though Ott was handcuffed and outside of the car."

Once an officer lawfully arrests an individual, the officer is permitted to search, incident to that arrest, the individual's person, the passenger compartment of the car, and any containers found in the passenger compartment. *United States v. Taylor,* 857 F.2d 210, 214 (4th Cir.1988); *see also New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In *Belton,* the Supreme Court construed the term 'container' to mean "any object capable of holding another object ... includ[ing] closed or open glove compartments...." *Id.* 453 U.S. at 461 n. 4, 101 S.Ct. at 2864 n. 4, 69 L.Ed.2d at 775 n. 4. Further, we think that under *Belton,* an officer may conduct a vehicle search even though the defendant has been removed from the car, handcuffed, and even placed in the police cruiser. *See* 3 *W. LaFave,* § 7.1(c), at 15 n. 73 (1987 & Supp.1991).

ORDER GRANTING MOTION TO SUPPRESS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR TRIAL; APPELLEE TO PAY THE COSTS.