753 A.2d 519

**Rondorian Wayne CARTNAIL**

v.

**STATE of Maryland.**

No. 84, Sept. Term, 1999.

Court of Appeals of Maryland.

June 14, 2000.

274

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL JJ.

HARRELL, Judge.

Mr. Rondorian Wayne Cartnail, Petitioner, was found guilty at a bench trial, following a not guilty plea and upon an agreed statement of facts, in the Circuit Court for Frederick County of driving with a revoked license. Immediately prior to trial, Petitioner unsuccessfully moved to suppress evidence obtained by the police as a result of a traffic stop. The trial judge sentenced Cartnail to one year in prison, suspended all but four months of the term of incarceration, and directed a two year probation upon his release.

Petitioner appealed to the Court of Special Appeals, arguing that the Circuit Court erred in denying the motion to suppress. In an unreported opinion, the Court of Special Appeals affirmed. We granted Petitioner's request for a writ of certiorari which presented the following question:

Did a police officer have reasonable suspicion to stop a gold Nissan occupied by two black men approximately one hour and fifteen minutes after the report of an armed robbery in a different section of the city of Frederick where the report indicated that a gold or tan Mazda with unknown tags and

occupied by three black men had fled in "no known direction"?

We reverse and hold that the police did not have reasonable suspicion to stop and seize Petitioner.

I.

The relevant facts of this case, proffered by counsel at the suppression hearing, are not in dispute. What to make of those facts, however, is the crux of the case. At approximately 1:49 a.m. on 26 August 1997, the City of Frederick police investigated a reported robbery of the Quality Inn hotel at 420 Prospect Avenue, located near the interchange of Interstate 70, Interstate 270, Route 15, and Route 340 in Frederick. Information supplied to the police from unidentified sources was that three black male suspects had fled from the scene in an unknown direction driving a gold or tan Mazda. That also was the extent of the information made available to the patrol officer who later encountered Petitioner.

At approximately 3:05 a.m. of the same morning, Petitioner was observed by a patrol officer driving a vehicle in the vicinity of West 7 th Street and the Frederick Memorial Hospital, an area of the City of Frederick northeast of where the Quality Inn is located.[1] He was pulled over by the officer. The officer stopped Petitioner based on the information he had

---

1. Although not offered formally in evidence at the suppression hearing, the arresting officer's "report" was referred to by Petitioner's trial counsel as the source of his recitation of the facts to the Court. The officer's written Statement of Probable Cause form, dated 26 August 1997, in the court file seems to be the only "report" in the record to which counsel or the Court could have had reference. From it, we have gleaned the addresses of the Quality Inn and where Petitioner was stopped, although counsel did not announce orally the addresses in open court. Counsel offered the characterization that the location of the stop was in a "completely different section of Frederick" than where the reported robbery occurred. Although trial counsel and the trial court presumably appreciated the distance between and the orientation of these two locations, we, by dint of judicial notice of generally reliable information obtained from a scaled map of the City of Frederick, note that distance, by the most direct vehicular travel route, to be 2 miles approximately.

received regarding the Quality Inn robbery. At the time, Petitioner was driving a gold Nissan and had one passenger with him. Both Petitioner and his guest are black men.

The officer requested Petitioner's driver's license and registration. Petitioner volunteered that he was driving on a revoked driver's license. After apparently requesting a computer check of Petitioner's driving record, the officer confirmed that he was in fact driving with a revoked license.[2]

Petitioner was arrested and charged based on the information obtained pursuant to the traffic stop. At the suppression hearing, Petitioner moved to suppress "any statements [he made] after the stop or any resulting information" because the officer did not stop him due to suspicion of having committed a traffic violation, nor did the officer have a reasonable, articulable suspicion of any other criminal activity. The State responded that the police officer had articulable suspicion based on the information obtained about the robbery earlier that morning and, even if that information did not support an articulable suspicion, the officer would have obtained the disputed evidence by inevitable discovery.[3]

The Circuit Court concluded that the officer had an articulable suspicion to pull over Petitioner and denied the motion to suppress. In addition to noting that the roads in the early morning hours are sparsely populated, the trial judge stated:

[w]ell, what impresses me in this case is the—apparently there was not the exact identification of the first car that indicated it might have been a Mazda. You said gold or tan Mazda with unknown tags occupied by three people. Well, you don't have to be a genius to figure that if there was three people, one or more could have been let out in an hour and 15 minutes. Considering the time that was involved and certainly the similarity between a—I'm familiar with

---

2. The officer apparently ceased to consider Petitioner as one of the robbery suspects at some point.

3. The parties have not briefed or argued the issue of inevitable discovery in this Court.

both types of cars, a Mazda and a Nissan, and one was described as a gold or tan Mazda and then the other was, when they found the Nissan, it was gold in color and occupied by two black males, and black males, three in number, had been described by the officer at the time of the investigation of the suspected robbery. Under those circumstances, I think certainly that's an articulable reason for the officer to check on that vehicle . . .

After denial of the motion, the parties proceeded on a not guilty plea and an agreed statement of facts, the latter comprised of Petitioner's trial counsel reading from the arresting officer's Statement of Probable Cause. Petitioner was found guilty of driving with a revoked license.

He appealed to the Court of Special Appeals which, affirming the Circuit Court's judgment, held:

[I]n this case, the color of the vehicle was the same as that reported, the vehicle type was similar, it was in the same metropolitan area, and it had multiple occupants. The stop occurred in the early morning hours when there were few vehicles on the street. *See Watkins v. State,* 90 Md.App. 437 [601 A.2d 1115] (1992) (A police officer responding to a robbery was advised that the robbers were two black men who left in a small compact car. One of the men was described as wearing a grayish sweat jacket, and the other was described as having a thin beard, a mustache, and large eyes. The officer stopped three black men in a Hyundai car approximately thirty minutes after the incident. One of the occupants had characteristics similar to one of the robbers described by the witnesses. The stop was held to be lawful.)

While presenting a closer question than that in *Watkins,* we conclude that the motion to suppress was properly denied.

We granted certiorari to decide whether the police stop of Petitioner was lawful.

## II.

Petitioner contends essentially that the only description of the robbery suspects, used by the police officer to pull him over, was that they were three black men who drove away from the robbery scene in an unknown direction in a gold or tan Mazda over an hour and fifteen minutes before Petitioner was stopped. He asserts that such information does not support a reasonable and articulable suspicion for the police officer to stop his vehicle simply because he was driving in another part of Frederick later that same morning, that he and his passenger are black men, and that he was driving a gold Nissan. In sum, he believes the police officer was operating on a "hunch."

The State argues that the police officer had a reasonable and articulable suspicion to stop Petitioner based on the facts and circumstances known to the officer at the time. It argues:

> There had been an armed robbery in the area and a description of the suspects' car was broadcast as "a gold or a tan Mazda ... [with] three black males in the vehicle." [Petitioner] quibbles that his car did not exactly match the description broadcast over the police radio. His car was a gold Nissan and he had only one other person in the car. However, as the trial judge suggested, cars made by Nissan and Mazda, both Japanese manufacturers, are similar in appearance and could have been easily confused by a witness. As the trial judge also observed, [Petitioner] could have dropped a third passenger off at any time subsequent to the robbery. A gold Nissan with two black males substantially matched the description with which the police were working and [Petitioner's] vehicle was hardly selected at random or on a "hunch" as he insists. Furthermore, the fact that the robbery took place at 1:49 a.m. and the car was stopped at 3:05 a.m. on August 26, 1997, a Tuesday, means that there would have been very few cars on the road, making the gold Nissan stand out even more.

[Petitioner] also complains that the stop, which occurred an hour and sixteen minutes after the robbery, was too

remote in time and in a "completely different section of Frederick." First of all, [Petitioner] cannot have it both ways. He cannot simultaneously complain that, after an hour and sixteen minutes, a suspect car would have both remained at the scene of the crime and been long gone. In any case, the trail was hardly cold after a little more than an hour. Prospect Avenue, where [Petitioner's] car was stopped, is about a mile from the interchange of Interstates 70 and 270 where the armed robbery took place. [Petitioner's] car was located where one might expect to find it: away from the scene of the crime, but still within the general area. As the suppression judge noted, he would not have expected to find a robber within a half block of where the robbery took place.

The State contends that several factors must be considered when determining whether the totality of the circumstances suffices to establish reasonable suspicion, including whether the description of the suspects was sufficient to narrow the class of persons who could be stopped, the size of the area where the suspects might be located, and the number of persons that are in the area at the time the police make the stop. It elaborates as follows:

Assessing these facts in light of the factors relevant to similar stops, the officer had reasonable suspicion to stop [Petitioner]. First, the description was sufficient to narrow the class of persons who could be legitimately stopped. The lookout was for a gold or tan Mazda with three black males. As LaFave notes, "in the last analysis the most important consideration is whether the description is sufficiently unique to permit a reasonable degree of selectivity from the group of all potential suspects" [citation omitted]. Although the description was somewhat general, it narrowed the class of persons to a single race and gender, and the type of car by color and manufacturer. The next factor, size of the area, also increases the reasonableness of the stop. The question is whether the person stopped was "within the range of possible flight." [citation omitted]. Here, of course, [Petitioner's] car was stopped near the reported crime scene

of the robbery within an hour and 15 minutes of the crime. The third factor, number of persons in the area, also supports the stop. At 3:05 in the morning on a weekday, in an area such as Frederick, there obviously would be very few cars on the road, particularly ones matching the description contained in the lookout . . .

Given the sum total of information, the officer's stop of [Petitioner's] car was reasonable.

We disagree with the State that the stop of Petitioner was reasonable. To the contrary, the police action in this case trespassed into unconstitutional territory.

### III.

### A.

Our review of a circuit court's denial of a motion to suppress evidence under the Fourth Amendment ordinarily is limited to information contained in the record of the suppression hearing. *See Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691, 693 (1997); *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22, 22 (1990); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987). We do not look at the trial record for additional information, nor do we engage in *de novo* fact-finding. *See Trusty,* 308 Md. at 670, 521 A.2d at 755. As the State was the prevailing party on the motion, we consider the facts as found by the trial court, and the reasonable inferences from those facts, in the light most favorable to the State. *See Ferris,* 355 Md. at 368, 735 A.2d at 497; *In re Tariq A–R–Y,* 347 Md. at 488, 701 A.2d at 693; *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Simpler,* 318 Md. at 312, 568 A.2d at 22. Issues of law and mixed questions of law and fact are reviewed *de novo. See Ornelas v. United States,* 517 U.S. 690, 696–98, 699, 116 S.Ct. 1657, 1661–63, 1663, 134 L.Ed.2d 911, 919–20 (1996). *See also Ferris,* 355 Md. at 368, 735 A.2d at 497. If the Fourth Amendment is implicated by State action, this Court makes an independent determination of whether the State has violated an individual's constitutional

rights by applying the law to the facts. *See In re Tariq A–R–Y,* 347 Md. at 489, 701 A.2d at 693; *Riddick,* 319 Md. at 183, 571 A.2d at 1240; *Whiting v. State,* 125 Md.App. 404, 406, 725 A.2d 623, 625 (1999). *See also Ornelas,* 517 U.S. at 696–97, 116 S.Ct. at 1661–62, 134 L.Ed.2d at 919–20.

B.

The Fourth Amendment of the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It has long been said that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 898–99 (1968) (citing *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891)). "To this end, its main import is the protection against invasions of the sanctity of one's person, home, and the privacies of life." *In re Tariq A–R–Y,* 347 Md. at 490, 701 A.2d at 693.

The protections of the Fourth Amendment are applicable to the State of Maryland through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59, 61 (1991). "The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches and seizures." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985). *See also In re Tariq A–R–Y,* 347 Md. at 490, 701 A.2d at 693. It is fundamental, under Federal and Maryland jurisprudence, that the detention

of a motorist pursuant to a police traffic stop is a seizure encompassed by the Fourth Amendment. *See Sharpe,* 470 U.S. at 682, 105 S.Ct. at 1573, 84 L.Ed.2d at 613; *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617 (1975); *United States v. Mallides,* 473 F.2d 859, 861 (9th Cir.1973)(a "person whose vehicle is stopped by police and whose freedom to drive away is restrained" is seized under the Fourth Amendment); *Ferris,* 355 Md. at 369, 735 A.2d at 497; *Derricott v. State,* 327 Md. 582, 587–88, 611 A.2d 592, 595–96 (1992); *Pryor v. State,* 122 Md.App. 671, 679, 716 A.2d 338, 342 (1998); *Goode v. State,* 41 Md.App. 623, 629–30, 398 A.2d 801, 805 (1979); *Williams v. State,* 19 Md.App. 204, 210, 310 A.2d 593, 597 (1973). The reasonableness of an investigative traffic seizure is evaluated under a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe,* 470 U.S. at 682, 105 S.Ct. at 1573, 84 L.Ed.2d at 613 (citing *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905). In the case *sub judice,* it is the first part of the *Terry* dual inquiry that concerns us.

 . A number of legal theories can justify motorist seizures, including the execution of a valid warrant or warrantless situations harnessed by probable cause, such as traffic violations or evidence of criminal activities. *See generally In re Tariq A–R–Y,* 347 Md. at 490–91, 701 A.2d at 693–94; *Pryor,* 122 Md.App. at 678–82, 716 A.2d at 342–44. Absent a warrant or probable cause, the forced stop of a motorist may be had under the Fourth Amendment when the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion." [4] *Ferris,* 355 Md. at 384, 735 A.2d at

---

4. In *Terry,* the Supreme Court, in discussing the protections of the Fourth Amendment, segmented the Warrant Clause, which encompasses the issuance of a valid a warrant, from the general proscription against unreasonable searches and seizures:

506. The Supreme Court has held that this standard can be constitutionally applied to seizures based on suspicion of past criminal activity. *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 612 (1985). *See also Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984); *Pryor*, 122 Md.App. at 679, 716 A.2d at 342 (noting that "[i]t is well settled ... that the forcible stop of a motorist may be based on reasonable articulable suspicion that is insufficient to establish probable cause"). Under such circumstances, the police are permitted to stop and briefly detain a person to investigate the suspicion. *See Derricott*, 327 Md. at 587, 611 A.2d at 595.

In *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612, 616–17 (1972), the Supreme Court elaborated on the need for some lesser standard than probable cause to effect a constitutional stop:

> In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.

---

If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether 'probable cause' existed to justify the search and seizure which took place. However, that is not the case. We do not retreat from our holdings that the police, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances. But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.

392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905 (citations omitted). *See also Anderson v. State*, 282 Md. 701, 387 A.2d 281 (1978)(discussing *Terry* ).

On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

(citations omitted).

In *Quince v. State*, 319 Md. 430, 434, 572 A.2d 1086, 1088 (1990), this Court recognized the *Terry* stop as an effective crime fighting tool:

Although the necessity to strike a proper balance between the interests of the person and those of the government may require the imposition of additional restraints when the *Terry* stop is made solely to investigate a past crime, the Supreme Court has made it clear that strong concerns for public safety and for effective crime prevention and detection clearly justify the application of *Terry* principles where there exists reasonable suspicion of ongoing or imminent criminal activity.

There is no standardized litmus test that governs the "reasonable suspicion" standard, and any effort to compose one would undoubtedly be futile. *See Ornelas*, 517 U.S. at 695, 116 S.Ct. at 1661, 134 L.Ed.2d at 918 (noting that it is impossible to articulate, with precision, what "reasonable suspicion" means). The concept of reasonable suspicion purposefully is fluid because "like probable cause, [it] is not 'readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989). *See also Ornelas*, 517 U.S. at 695–96, 116 S.Ct. at 1661, 134 L.Ed.2d at 918. It is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. *See Ornelas*, 517 U.S. at 695, 116 S.Ct. at 1661, 134 L.Ed.2d at 918. Despite its fluidity, the Supreme Court "characterized 'reasonable suspicion' as 'one of the relatively simple concepts embodied in the Fourth Amendment.'" *State v. Lemmon*, 318 Md. 365, 378, 568 A.2d 48, 55 (1990) (discuss-

ing *Sokolow* ). The Court has tiered various standards to provide more guidance to federal and state courts:

> The officer ... must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" The Fourth Amendment requires "some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause.

*Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10 (citations omitted). *See also Derricott,* 327 Md. at 593, 611 A.2d at 598; *Quince,* 319 Md. at 433–34, 572 A.2d at 1088; *Anderson,* 282 Md. at 707, 387 A.2d at 285. In a later case, the Supreme Court elaborated:

> [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause ... [An] unverified tip from [a] known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion.

*Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 308–09 (1990) (citations omitted). *See also Lemmon,* 318 Md. at 377, 568 A.2d at 54; *Watkins v. State,* 90 Md.App. 437, 441, 601 A.2d 1115, 1117 (1992).

As former Chief Justice Burger explained in *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 698, 66 L.Ed.2d 621, 629 (1981), the totality of the circumstances test contains two interdependent analytical techniques:

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, . . ., said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."

(Citations omitted). *See also Lemmon*, 318 Md. at 378, 568 A.2d at 55; *Graham v. State*, 325 Md. 398, 408, 601 A.2d 131, 135–36 (1992).

■ This Court has held that when looking at the totality of the circumstances to determine whether the State illegally

effected a Fourth Amendment seizure, we use the facts as deemed credible by the trial judge. *See Lemmon,* 318 Md. at 379, 568 A.2d at 55. LaFave has noted that courts generally consider the following "reasonable suspicion" factors:

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.). *Accord Lemmon,* 318 Md. at 379, 568 A.2d at 55; *Anderson,* 282 Md. at 707, n. 5, 387 A.2d at 285; *Snow v. State,* 84 Md.App. 243, 254, 578 A.2d 816, 821 (1990); *Mosley v. State,* 45 Md.App. 88, 92–93, 411 A.2d 1081, 1084–85 (1980). All of these variables, considered as a whole picture, must establish a "minimum level of objective justification" of the seizure. *See Graham,* 325 Md. at 408, 601 A.2d at 135–36. Our determination will not rest on the actual motivations of the police officer. *See Ferris,* 355 Md. at 391–92, 735 A.2d at 510. *See also Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1773, 135 L.Ed.2d 89, 98 (1996); *United States v. Hill,* 131 F.3d 1056, 1059 (D.C.Cir.1997). Rather, the objective justification requires us to evaluate whether a reasonable and prudent police officer would have been warranted in believing that Petitioner had been involved in criminal activity. *See Ornelas,* 517 U.S. at 696, 116 S.Ct. at 1661–62, 134 L.Ed.2d at 919; *Ferris,* 355 Md. at 384, 735 A.2d at 506.

 We hold that the record of the suppression hearing in the present case fails to establish that a reasonable and prudent police officer would have had reasonable suspicion to stop Petitioner and, therefore, the stop was constitutionally illegal under the Fourth Amendment. There is no question that the police officer in this case was operating on a "hunch" that Petitioner and his passenger may have been two of the

three suspects associated with the reported robbery of the Quality Inn.

We are struck first by the lack of corroboration between the description of the robbery suspects and the circumstances surrounding Petitioner at the time of the stop. At the outset, we note that two of the reasonable suspicion factors—observed suspicious activity of the motorist and knowledge that the motorist has been involved in other criminal activity of similar ilk but in an unrelated ˙case—are inapplicable here. The State admits that, at the time of the stop, Petitioner was not engaged in any suspicious activity, that there was no reason to believe that Petitioner was involved in another criminal case, and that he appeared to be operating his vehicle in compliance with the apparent rules of the road.

Here, a reasonable police officer had only facially innocent activity to generate reasonable suspicion because no suspicious activity had been personally observed.[5] In *Ferris*, we considered the issue of innocent activity and when it can lead to a reasonable articulable suspicion if placed in proper context. 355 Md. at 386–87, 735 A.2d at 507. We observed that the Supreme Court, in *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890, 894 (1980), explained that "factual circumstances which 'describe a very large category of presumably innocent travelers' cannot, in and of themselves, justify a seizure." *Ferris*, 355 Md. at 386, 735 A.2d at 507. We contrasted *Reid* against *Sokolow* where the Court explained that a series of acts which could appear naturally innocent if viewed separately may collectively warrant further investigation by grounds of reasonable suspicion. *See Ferris*,

---

**5.** The Court of Special Appeals compared Petitioner's case with *Watkins* to affirm Petitioner's conviction. *Watkins* is distinguishable from the case *sub judice*. In *Watkins*, the police officer was able to match Watkins with information received about a robbery that occurred half an hour before he pulled Watkins over. The description of the get-away car, a "small compact car," matched, and more importantly, the police officer was able to match Watkin's physical characteristics with that of one of the robbery suspects and the officer noticed an article of clothing over the headrest of the driver's seat that matched a robbery suspect's clothing. *See Watkins*, 90 Md.App. at 440, 601 A.2d at 1116.

355 Md. at 386, 735 A.2d at 507. *Ferris* reconciled the two parallel decisions by adopting the reasoning of *Karnes v. Skrutski,* 62 F.3d 485 (3 rd Cir.1995):

> The Third Circuit reasoned that, although the factors relied upon in *Sokolow* to find reasonable suspicion were consistent with innocent travel, they were nonetheless " 'out of the ordinary.' " *Id.* at 493 (quoting *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1586). *Karnes* emphasized the distinction between individual factors which are consistent with innocent travel, but nonetheless out of the ordinary, and individual factors which are both consistent with innocent travel and too commonplace to be probative in tending to show criminal activity. *Id.* *Accord United States v. Lambert,* 46 F.3d 1064, 1069 (10th Cir.1995). *See also United States v. Alarcon–Gonzalez,* 73 F.3d 289, 293 (10th Cir.1996). The Third Circuit's decision in *Karnes* also recognized that the reasonable suspicion standard, as applied to the totality of the circumstances, must be narrow enough to eliminate a great number of objectively innocent individuals:
>
>> *Reid* and *Sokolow,* taken together, demonstrate it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.
>
> *Karnes,* 62 F.3d at 493.

*Ferris,* 355 Md. at 386–87, 735 A.2d at 507.

■ The remaining reasonable suspicion factors, as discussed by LaFave,—the level of detail of the description of the suspects, the size of the area where the suspects may have been found, the number of persons in the area at the time of the stop, and the direction of flight—we consider as a whole picture. In looking at the description of the suspects, undoubtedly physical characteristics, such as race [6], gender, eth-

---

6. While it is well settled that race and ethnicity are identifying factors to be considered, they never can justify, by themselves, a *Terry* stop.

nicity, hair color, facial features, age, body build, or apparel of a suspect permits winnowing of innocent travelers. *See* 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195–96 (3d ed.1996 and 2000 Supp.). In addition to personal appearance, LaFave explains:

> Quite obviously, it is also of considerable help if it is known that the offender actually or likely left the crime scene in a vehicle. And if a vehicle is involved, it is extremely useful to know something about the appearance of the car, such as its color, condition, special equipment, vintage or manufacturer, to have even part of the license number, or to know the number of occupants. This type of information is often very helpful notwithstanding the existence of detailed information about the offender's personal appearance, for the latter may be of little use when the offender is traveling by car and surveilling police cannot determine without first making a forcible stop whether any particular potential suspect has those characteristics.

4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 197–98 (3d ed.1996 and 2000 Supp.). In essence, the more detailed and unique the description of the suspects, the more likely the police will have authority under the Fourth Amendment to make a *Terry* stop because the potential persons on the road matching the description will be fewer. *See* 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 198 (3d ed.1996 and 2000 Supp.). In assessing both the quality and quantity of details in the description, "the most important consideration is whether the description is sufficiently unique to permit a reasonable degree of selectivity from the group of all potential suspects." 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 198 (3d ed.1996 and 2000 Supp.). Furthermore,

---

See *Brignoni–Ponce,* 422 U.S. at 885–86, 95 S.Ct. at 2582–83, 45 L.Ed.2d at 619–20 (Mexican ancestry is not alone enough to satisfy the reasonably suspicion standard); *United States v. Bautista,* 684 F.2d 1286, 1289 (9 th Cir.1982)(race is insufficient basis for investigatory police stop); *United States v. Clay,* 640 F.2d 157, 159 (8 th Cir. 1981)(race cannot be sole factor as grounds for police suspicion).

[i]n determining whether a particular description is sufficiently unique, the description cannot be considered in a vacuum. The ultimate question is whether the description affords a sufficient basis for "selective investigative procedures" vis-a-vis a universe made up of all persons within fleeing distance of the crime in question, and thus the characteristics of that group must be taken into account.

4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 199 (3d ed.1996 and 2000 Supp.). That universe, according to LaFave, "will be determined primarily by the size of the area within which the offender might now be found (as indicated primarily by the amount of time which has passed since the offense) and the number of people about in that area ..." *See* 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 198, n. 297 (3d ed.1996 and 2000 Supp.).

Here, aided by the early morning hour and sparsely populated streets, a reasonable and prudent police officer in this case could draw upon five factors to generate reasonable suspicion—gender, race, number of suspects, color of the car, car manufacturer, time of the robbery, and location of the robbery. In *Ferris* we explained that:

a police officer, "by reason of training and experience, may be able to explain the special significance of ... observed facts." Thus, conduct that appears innocuous to the average layperson may in fact be suspicious when observed by a trained law enforcement official. The Fourth Amendment, however, does not allow the law enforcement official to simply assert that apparently innocent conduct was suspicious to him or her; rather the officer must offer "the factual basis upon which he or she bases the conclusion."

355 Md. at 391–92, 735 A.2d at 510 (citing and discussing *Derricott*, 327 Md. at 591, 611 A.2d at 597). The only factors present that matched Petitioner's circumstances were gender, race, and arguably the color of the car. The other factors were too tenuously corroborated, or not corroborated at all, by Petitioner's circumstances. There is no indication whatsoever that the factors considered in their totality were any more

suspicious than their individual components. *See Ferris,* 355 Md. at 392, 735 A.2d at 510. Certainly, "[t]his is not a case where facts observed by the police officer take on a special meaning when viewed through the eye of that officer." *Derricott,* 327 Md. at 591, 611 A.2d at 597. Furthermore, "[a]lthough the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" *United States v. Wood,* 106 F.3d 942, 948 (10 th Cir.1997)(citing *Karnes,* 62 F.3d at 496).

We reject the State's claim that the supposed corroboration of Mazda and Nissan vehicles here can sufficiently narrow the group of innocent travelers. We doubt that a reasonable officer would equate a gold or tan Mazda with a gold Nissan simply on the basis that they are "both Japanese" vehicles. Such a justification by the State seems tenuous to us. Under this premise, the police, with solely a gold or tan Mazda manufacturer description, would have unfettered discretion to pull over seemingly infinite combinations of drivers. Within this assumptive universe would be any gold or tan (or other similar color—yellow, beige, light brown, "champagne") vehicle, be it early model or late model; two door, four door, or five door; sub-compact, compact, convertible, sedan, station wagon, van, SUV, pick up truck, or sport car; and, whether attributed to any so-called "Japanese" manufacturer such as Honda, Subaru, Toyota, Isuzu, Mitsubishi, Nissan, Suzuki, and perhaps affiliated luxury manufacturers such as Lexus, Infiniti, or Acura, as well as vehicles manufactured by Japanese automakers and sold under non-Japanese manufacturer logos such as General Motors, Daimler–Chrysler, or Ford.[7]

---

7. We acknowledge that a host of variables could add to the probative value of the vehicle description such as the type of vehicle, i.e., sedan, compact, subcompact, SUV, van, or pick-up, or whether the getaway car was a late model vehicle or an earlier model. Furthermore, we need not decide whether our analysis would be different had the police

We stress, in considering the "whole picture," that the size of the area, or "range of possible flight," that the suspects could have taken after approximately one hour and fifteen minutes following the robbery is relatively enormous at its circumference, particularly because the suspects escaped in no known direction and in an area immediately adjacent to two interstate highways and three other major roadways. LaFave has noted that a significant difference exists between spotting a suspect within minutes of a crime, as opposed to an hour later, because " 'the time and spatial relation of the 'stop' to the crime' is an important consideration in determining the lawfulness of the stop. The elapsed time indicates the minimum distance it would be possible for the offender to have covered since the crime, and this in turn supplies the radius of the area in which he might be found." 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 204 (3d ed.1996 and 2000 Supp.). With multiple interstate roadways near the robbery site, the suspects could have remained in the City of Frederick or just as easily fled in the intervening time in to Frederick County or even other urban centers such as Hagerstown, Baltimore, Washington, D.C., Annapolis, or rural areas in Maryland, Virginia, West Virginia, or Pennsylvania. Given the circumstances, the State has provided no valid, logical reason why the robbery suspects would remain in Frederick any more than they would have traveled outside of Frederick in the one hour and fifteen minutes after the robbery. We cannot say that, all other things regarding the suspects' description remaining unchanged, a reasonable police officer could have pulled over Petitioner in any one of those metropolitan cities or in another sister state under such a flimsy guise of "reasonable suspicion."

 It is of no surprise that courts place heavy weight on whether the stop of a suspect was accomplished in the late evening or early morning hours, when fewer people are out in public, as compared to the daylight or early evening hours

---

officer in this case pulled over Petitioner had he been driving a Mazda without further description.

when more people are out and about. 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 206 (3d ed.1996 and 2000 Supp.). The time of day can narrow the number of innocent people on the road and aid the police in honing in on criminal suspects. Nonetheless, absent exigent or unusual circumstances, early morning hours may also provide police with more opportunity to observe a motorist suspected of criminal activity before initiating a *Terry* stop since there is less public activity to divide their attention. We have no reason to believe, in the case *sub judice,* that if the robbery suspects escaped in a Mazda vehicle, a reasonable police officer comparing the description of the suspects against the circumstances of Petitioner in all other respects (e.g., race, gender, and color of vehicle), could also determine the make of the vehicle before intruding on Petitioner's travel. The record clearly shows that Petitioner gave no indication he was engaged in criminal activity, nor did he commit a moving traffic violation, that would have triggered immediate police reaction. For as much as the suppression hearing record reveals, Petitioner's vehicle evidenced no outward violations of the motor vehicle laws, such as a malfunctioning light, missing license plate, or the like. We note that, despite the fact that there are usually less people in public during the early morning hours, a driver is still entitled to privacy at any time of the day and should not be disturbed by the police without constitutional authority.

We conclude that the details of the robbery suspects used by the patrol officer to make the stop did not reasonably and articulably match Petitioner's circumstances.[8]

---

8. The State analogizes numerous out-of-state cases with the circumstances of this case to support the Circuit Court's denial of Petitioner's motion to suppress the evidence. *See e.g., Medrano v. State,* 914 P.2d 804 (Wyo.1996); *Commonwealth v. Jackson,* 451 Pa.Super. 129, 678 A.2d 798 (1996); *Wells v. Commonwealth,* 6 Va.App. 541, 371 S.E.2d 19 (1988). Because, as the State acknowledges, this particular analysis is fact sensitive and distinguishable, we find their factual comparisons unpersuasive here.

██ By refusing to harbor the fruits of unconstitutional seizures, we give teeth to the notion that the courts cannot accord police carte blanche to pick and choose whom to stop based on some "hunch" that a motorist, or his or her passengers, are involved in criminal activity such as in the case *sub judice.* *See Jones v. State*, 319 Md. 279, 288, 572 A.2d 169, 174 (1990). *See Illinois v. Wardlow*, 528 U.S. ——, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570, 575–77 (2000); *Anderson*, 282 Md. at 707, 387 A.2d at 285. We remind that "[b]ecause the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike." *Sokolow*, 490 U.S. at 11, 109 S.Ct. at 1587, 104 L.Ed.2d at 13 (Marshall, J., dissenting). "We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment." *Ferris*, 355 Md. at 393, 735 A.2d at 511 (citing *Florida v. Royer*, 460 U.S. 491, 513, 103 S.Ct. 1319, 1332, 75 L.Ed.2d 229, 246 (1983)(Brennan, J. concurring)). As aptly noted by Justice Scalia: "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Riddick*, 319 Md. at 205, 571 A.2d at 1251 (citing *Arizona v. Hicks*, 480 U.S. 321, 329, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347, 357 (1987)).

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY FREDERICK COUNTY.