BELSON, Senior Judge,
dissenting:
I respectfully dissent from the holding that the police did . not have a reasonable, particularized, articulable suspicion that the car they stopped was transporting persons who had committed a robbery a few minutes before. I will begin by briefly restating the facts.
I.
Shortly after noon on Tuesday, February 12, 2013, Jonathan Klipa, an officer of the United States Capitol with twelve years of experience patrolling the streets of the Capitol Hill area, heard a Metropolitan Police Department (MPD) radio call that alerted him to a recent street robbery with a gun. Officer Klipa testified that “I heard the location of which way he was headed, and I just went down D Street, thinking that if he comes south he’s going to come up around 4th—4th or 6th Street.” He further testified that he was looking for “[a] white car with tinted windows.” Following up on his appraisal of what the robbers might do, he was proceeding east on D Street, N.E., around Third and Fourth Streets, at about 12:15 p.m., when he spotted at Fifth and D Streets, N.E., a white Chevrolet Lumina with four doors and tinted windows headed south. i ■
There had been, in fact, two highly similar'robberies that had been the subject of radio lookouts minutes before Officer Klipa spotted the white Chevrolet Lumina. The first robbery took place in the 1600 block of Maryland Avenue, N.E., near where Maryland Avenue, H Street, Fifteenth Street and Benning Road, N.E., meet, shortly after 12:00 noon, and the second at Eighth and H Streets, N.E., at about 12:12 p.m.
The first street robbery of a man selling single cigarettes, Michael Prince, led to an alert at 12:05 p.m. for “possibly a , white Mercury Sable” which had left eastbound on Maryland Avenue. It is reasonable to infer from what happened next that the car soon changed directions and went to Eighth and H Streets, N.E., 'less than ten blocks west of the scene of the first robbery. After the subsequent 12:12 p.m. robbery at Eighth and H Streets, N.E., of Ezell Whitaker, a second man selling sin *115 gle cigarettes, Officer Frank Brown, a witness to that robbery, broadcasted a second lookout for a white car with tinted windows headed northbound on Seventh Street, N.E. Inferentially, and as Officer Klipa had anticipated, the white car with tinted windows changed directions again before Officer Klipa first saw it, a Chevrolet Lumina, as it headed south on Fifth Street at D Street, N.E., approximately three minutes after the second robbery. Officer Klipa followed it until, another three minutes later, at 12:18 p.m., the police stopped the white Chevrolet Lumina with tinted windows at the corner of Eleventh Street and Independence Avenue, S.E. Appellants were in it, as well as the driver, Patrick Buckmon, and victim Whitaker’s backpack.
H.
A.
The brief foregoing statement of undisputed facts of record contradicts appellant Armstrong’s contention that the police quickly launched a “dragnet” search of a large part of the District of Columbia.[1] The entire area covered by the above description of events from the robberies to the spotting of the white vehicle is only about twelve blocks from east'to west and six blocks from north to south. Even if appellants’ vehicle travelled a bit beyond that area before doubling back, it could not have been very far beyond it because of the extremely short time that elapsed from crime to crime to stop.
It is doubtless true, as the majority opinion states, that the sum of the two vehicle lookouts given by Lieutenant Bed-lion and Officer Brown, “describpng] the suspects’ fleeing vehicle as' a white car, possibly Mercury Sable, with tinted windows and two black males .... without more, lacks the particularized specificity necessary to warrant the stopping of any vehicle within the District.”[2] Majority Op. at 108. But here there was much more.
First, when Officer Klipa caught sight of the car approximately three minutes after the second robbery, it was being driven south on Fifth Street, N.E., just where and when it would have been if the driver had headed north a short distance on Seventh Street[3] immediately after second robbery, turned west for a few blocks, and' then proceeded south on Fifth Street.
Second, the above description does not take into account additional details known to the police that matched the car that Officer Klipa spotted at Fifth and D *116 Streets, N.E. Specifically, the police had also learned that the white car that was “possibly a Mercury Sable” was an older four-door model.[4] Although the record does not establish conclusively whether Officer Klipa knew of this information or which lookouts—or parts thereof—-he heard over the MPD radio, this court has held that even when officers making a stop “did not themselves possess sufficient information to justify a Terry stop,” the collective knowledge of the police “provided the requisite reasonable grounds for the stop.” In re M.E.B., 638 A.2d 1123, 1129, 1131 (D.C. 1993) (also stating that “[t]he collective knowledge doctrine is firmly established in this jurisdiction in a line of cases going back at least thirty years” (internal quotation marks omitted)).
Third, the reasoning of the majority is premised in part on the supposition that there was a substantial probability that other similar white older American cars were being driven south on that street at that very time and place. That assumption does not contribute to a basis for a reversal. Fifth Street, N.E., at that point is a street in a residential neighborhood, rather than a thoroughfare, even though it may be proximate to “the busy H Street corridor.” Majority Op. at 113. Moreover, there is no reason to conclude based on the record or on common knowledge that older midsized white American sedans like a Sable or a Lumina with tinted windows and four doors constituted a sizeable percentage of cars traveling south in that place and at that time of day. Cars of American makes constitute only a portion of the cars seen driving on the streets of the District of Columbia, and older white American sedans with tinted windows and four doors are only a subset of such vehicles.
Fourth, only one other car was stopped during the minutes that the lookouts were in play, and that car was a Toyota Camry. No other American car was puiled over during the so-called “dragnet.” This fact too supports a conclusion that the police response to two street robberies was reasonable.
B.
The majority cites the opinion of the Maryland Court of Appeals in Cartnail v. State, 359 Md. 272, 753 A.2d 519, 531 (2000), in support of its decision to “reject the idea that the designation of a ‘white Mercury Sable’• as the getaway car provides police with sufficient particularized suspicion to justify the stop of any white ‘American sedan.’ ” Majority Op. at 109-10 The stark contrast between the facts in Cartnail and those in this case serves to demonstrate why the stop of the car involved here was in accordance with law.
Cartnail dealt with the stop of a gold-colored Nissan by Frederick, Maryland, police who received a report that a motel in that city had been robbed and that three suspects were fleeing from the scene of the robbery “in an unknown direction driving a gold or tan Mazda.” Id. at 522. More than an hour and fifteen minutes after the robbery police stopped a gold-colored Nissan with two occupants in a different part of the city about two miles from the scene of the robbery. Id. at 522 n.1, 524. The court rejected the state’s argument that the description of the make and color of the vehicle sufficiently nar *117 rowed the group of travelers who might be suspected.
In doing so, the court stressed the importance of the large size of the area in which the suspects might have been found one hour and fifteen minutes after the robbery, and also pointed out that LaFave “has noted that a significant difference exists between spotting a suspect within minutes of a crime, as opposed to an hour later, because “the time and spatial relar tion of the ‘stop’ to th'e crime’ is an important consideration in determining the lawfulness of the stop.’” Id. at 531-32 (quoting 4 Wayne R. Lafave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4 (g), at 204 (3d ed. 1996 and 2000 Supp.)).
This observation by the Maryland Court of Appeals underscores the strongest factor that supports our sustaining the trial court’s ruling before us, a reason that distinguishes sharply this case from the case before the Maryland court. Officer Klipa spotted the white American sedan with tinted windows traveling south away from the scene of the second robbery about three minutes after the robbery took place and about seven blocks to the southwest of the robbery scene that the white sedan had left while, at that moment, going north. The fact that the white car with tinted windows left the scene of the second robbery going north from H Street on Seventh Street, N.E., fits well with the fact that three minutes later it was seen going south on Fifth Street, N.E., a concrete fact that the experienced Officer Kli-pa had anticipated. It cannot be assumed that fleeing robbers will travel in a straight line. Driving north for a short distance, turning west a few blocks, and then turning south on Fifth Street, would have put, and obviously did put, the white American car just where Officer Klipa spotted it some three minutes later.
The route the white American car took after being spotted demonstrates that it was not being driven in a straight line. However, as the trial judge found, it did not appear to be fleeing or engaging in any conduct that itself would give rise to a traffic stop. In other words, it can readily be inferred that the car was being driven in the way the driver had planned—which was not in a straight line away from the scene of the second robbery.
It is also pointed out that Officer Klipa did not identify the car when he spotted it by alluding to the race of the occupants. He referred only to the number of occupants he saw through the tinted windows of the white car. It is thus clear from the record that the car was spotted and followed not on the basis of the race of the occupants of the car, but on the basis of the description of the car and the time, distance and direction from the second robbery.[5]
The facts of this case were highly incriminating, and afforded ample grounds for stopping the car.
I respectfully dissent.

.The stop of the white car in this case was' not a “dragnet" search in the sense in which that term was used in In re A.S., 614 A.2d 534 (D.C. 1992), which dealt with the seizure of three youths. who resembled a generalized description. The stop here was of a white American car with tinted windows, as mentioned in a lookout, which was traveling away from the scene of an armed robbery that had occurred about three minutes earlier some seven blocks away. We add that the term "dragnet,” as defined in dictionaries in reference to police work, does not connote overly aggressive or unconstitutional police work— rather it means "a system in which the police look for criminals using systematic and thorough methods.” Black’s Law Dictionary 601 (10th ed. 2014).

. The majority states that the government first raised the tinted windows feature on appeal. Majority Op. at 105 n.6. But the record shows otherwise. The government in its September 18, 2013, Opposition to Defendant’s Motions to Suppress, argued that "[t]he officers here had reasonable and articulable suspicion to justify stopping the vehicle as it matched the two lookouts broadcast over MPD radio of a white four-door sedan with tinted windows.” (Emphasis added).

. The robbery of the victim Whitaker took place at Eighth and H Street, N.E., but appellant Joiner fled to Seventh Street before getting in the white car.

. The majority points out that other testimony—namely that the car could have been a Chevrolet—was impeached. Majority Op. at 105 n.5. But, "in deciding whether the motion to suppress was properly denied, we may of course consider all the evidence at the suppression hearing as well as the undisputed trial testimony.” West v. United States, 604 A.2d 422, 427 (D.C. 1992).

. Cartnail, 753 A.2d at 530 (stating that “[i]n looking at the description of the suspects, undoubtedly physical characteristics, such as race, gender, ethnicity, hair color, facial features, age, body build, or apparel of a suspect permits winnowing of innocent travelers” (citing Lafave, supra, § 9.4(g), at 195-96)).