51 A.3d 1

**STATE of Maryland**

v.

**Jamar HOLT a/k/a Jamal Holt.**

**No. 132, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Aug. 29, 2012.

540

Carrie J. Williams & Thiruvendran Vignarajah (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellant.

Kenneth W. Ravenell (Milin Chun, Murphy & Falcon, PA, on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., WRIGHT, JAMES R. EYLER (Retired, specially assigned), JJ.

JAMES R. EYLER (Retired, specially assigned), J.

On January 13, 2012, Jamar Holt, appellee, was charged with assault, firearms violations, and drug conspiracy charges. Appellee filed a motion to suppress evidence obtained as a result of the investigatory stop leading to these charges. After a hearing on March 2 and 5, 2012, the Circuit Court for Baltimore City granted in part and denied in part appellee's motion to suppress. The State filed a motion for reconsideration, which the circuit court denied on March 5, 2012. The State filed an interlocutory appeal that same day. On April 4, 2012, the circuit court filed a written order denying the motion for reconsideration. For the reasons set forth below, we shall reverse the circuit court's decision and remand for further proceedings.

## Factual and Procedural Background

The charges in this case stem from an investigatory stop of appellee's vehicle on July 13, 2011. The stop was the result of an ongoing investigation of suspected drug dealer Daniel Blue. The following facts were related by Detectives Joseph Crystal

and James McShane, members of the Violent Crime Impact Section of the Baltimore City Police Department, in written statements admitted into evidence and in testimony at the suppression hearing.

On June 29, 2011, Mr. Blue, who was "known [by law enforcement] for distributing raw heroin within Baltimore City," delivered 50 grams of raw heroin to Keith Townsend on a street corner in East Baltimore. The entire transaction was captured on a City Watch, or Blue Light, camera. Police saw Mr. Blue scanning his surroundings as he "exited the vehicle, as he approached Mr. Townsend, while he spoke to Mr. Townsend, [and] when he left Mr. Townsend." Mr. Blue then promptly returned to his vehicle and drove out of the area. Mr. Townsend was arrested as he walked away from the street corner, and the arrest team retrieved a plastic bag from Townsend's pocket that contained a piece of bread with 50 grams of raw heroin inside. Mr. Blue was not arrested that day.

On July 13, 2011, Detectives Crystal and McShane conducted surveillance of Mr. Blue when he appeared at the North Avenue courthouse. Prior to arriving at the courthouse, both detectives reviewed the video of the June 29th interaction between Mr. Blue and Mr. Townsend in order to familiarize themselves with Mr. Blue's mannerisms and actions. At the courthouse, Detective Crystal noted that Mr. Blue was not scanning his surroundings as he had during the drug transaction two weeks earlier. The detectives placed a GPS tracker on Mr. Blue's vehicle and followed him after he left the North Avenue courthouse. Mr. Blue drove to an apartment complex located in White Marsh, Baltimore County, where he entered the complex and returned moments later with a small Rubbermaid container. Mr. Blue then traveled back into Baltimore City, arriving at Lake Montebello in Northeast Baltimore City.[1]

---

1. We grant the State's request to take judicial notice of the fact that Lake Montebello is approximately 1.7 miles away from the North Avenue courthouse.

At Lake Montebello, Mr. Blue parked on a single road encircling the lake, just before a workout station, and got out of his vehicle. Detectives Crystal and McShane both noticed that Mr. Blue was again scanning his surroundings and looking over both of his shoulders. Mr. Blue walked toward and through the workout station and met with a man later identified as appellee. Mr. Blue continued to scan his surroundings while briefly speaking with appellee. Appellee did not look around before or after seeing Mr. Blue.

The two men got into a Jeep Cherokee parked near the workout station. Appellee entered the driver's side and Mr. Blue entered the passenger's side.. Appellee drove around the lake once before Mr. Blue got out of the car and walked back to his car. Appellee remained in the Jeep, turned left out of the park, and drove away.

The detectives followed appellee in the Jeep for several minutes. After appellee made a few turns, both detectives activated their emergency lights.[2] The Jeep came to a stop in the 1400 block of Filmore Street. Detectives McShane and Crystal positioned their vehicles in front and to the side of the Jeep, respectively, but did not block the Jeep. Both detectives exited their vehicles while announcing themselves as police. Detective McShane approached the Jeep from the front and repeatedly stated, "Police, let me see your hands." Detective Crystal approached from the rear driver's side. According to his written statement, Detective Crystal initially saw appellee's hands on the steering wheel, but then appellee lowered his right hand out of sight and quickly raised it to point a handgun directly at Detective McShane. According to Detec-

---

2. At the suppression hearing, both detectives testified that the Jeep rolled through a stop sign just before the detectives activated their emergency lights. The circuit court made a factual finding at trial, based on the credibility of the detectives, that the traffic violation did not actually occur, because the detectives "did not mention the traffic violation as the reason for the stop at any time prior to their testimony at the motions hearing." On appeal, the State does not contest the circuit court's factual determination that a traffic violation did not take place, but instead argues that the detectives possessed a reasonable suspicion that appellee was involved in criminal activity.

tive McShane's written statement, appellee then started driving the Jeep directly towards Detective McShane, who was able to move out of the vehicle's path. At some point during this melee, both detectives discharged their service weapons into the vehicle. Appellee left the scene, but later arrived at the University of Maryland Medical Hospital with gunshot wounds.

Appellee was indicted and charged with first and second degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, felon in possession of a firearm, and conspiracy to distribute narcotics. Prior to trial, appellee challenged the legality of the stop. The circuit court conducted a hearing on March 2 and 5, 2012. The court concluded that the stop violated appellee's constitutional rights under the Fourth Amendment because "there was no reasonable suspicion to justify an investigatory stop of Mr. Holt's vehicle." The court stated the following, in part, orally on the record:

> They wanted to stop it, they had a hunch, but I do not find that the purpose of that stop was for anything more than to find out who the driver of the vehicle was, and see if they couldn't search the vehicle to find drugs. That's what they wanted to do.
>
> . . .
>
> That there were a bunch of innocuous facts, some have absolutely nothing to do with Mr. Holt, even thought [sic] the police would like to pile it on and make it appear that it has something to do with Mr. Holt, it doesn't.
>
> Had the packaging been similar, had there been a call from Mr. Holt, had there been an observation of an exchange, had there been some way that Mr. Holt was involved in this enterprise, some evidence of it before the meeting at Lake Montebello. But there are too many innocent, innocuous facts.
>
> These innocent facts are going to Montebello where people work out. Taking your lunch with you, which is what is normally used. There's no evidence that drugs in Baltimore

when it's in large quantities are contained in Rubbermaid containers. There's no evidence that the officers previously observed Mr. Blue to put all his drugs in blue top Rubbermaid containers. There's no evidence that there was a container taken out [of] Mr. Blue's car, and placed into Mr. Holt's car.

There's no connection between Mr. Holt and drug activities of Mr. Blue that go back, at least to June 29th, none at all. They don't exist. It's not in this case. And it's a figment of the State's imagination. And the detectives. They wanted that to be the case, but there was no evidence of it. Their instincts and hunches and the hairs on the back of their necks were raised, but that does not make reasonable suspicion. So there was none.

On March 5, 2012, the court heard arguments on the scope of the remedy for the illegal stop. The circuit court ultimately determined that any testimony of an assault based on appellee pointing a firearm at Detective McShane would be suppressed, but that testimony of an assault based on appellee driving his Jeep toward Detective McShane would not. The court stated in part, orally on the record:

As it turns out, the gun is so connected and intertwined with the actions of the officers that the statement "let me see your hands" was an officer's direction to the defendant. And that direction resulted in him doing something. He's being ordered by law enforcement to act, let me see your hands. And that is a direct flow from the initial stop, which was illegal.

So he's at places and at times ordering the defendant to do something for which his presence on and about the defendant is illegal, unlawful, and therefore the Court flows— finds that the gun, and the observation of the gun in the hand of the defendant, directly flows from the initial, illegal stop. Let me see your hands. Yeah, well, what you see is the gun. Suppressed.

But after that the decision of the defendant to then take certain actions of his own initiative, different crime, differ-

ent event, the taint is attenuated by, I believe, a brief passage of time, but a different circumstance, and therefore the Court will allow the State to enter any evidence of an assault by the use of the vehicle, and any charges that flow from that interaction with the police.

The State filed a motion for reconsideration, which was denied on March 5, 2012. The State filed an interlocutory appeal that same day. On April 4, 2012, the court filed a written order denying the State's motion for reconsideration, in which it further explained its reasons for finding that the detectives lacked reasonable suspicion for conducting the stop and for suppressing evidence of the firearm and any observations of the firearm.[3] When addressing the issue of reasonable suspicion, the court stated, in part:

The State did not provide evidence to say that they saw Mr. Blue exit his vehicle with a Rubbermaid container or that there was a noticeable bulge in Mr. Blue's clothing in which a Rubbermaid container could have been hidden. Nor was there any evidence provided to support that Mr. Blue packaged all of his drugs in Rubbermaid containers. As to the Defendant, there was no evidence presented that he looked suspicious while at Lake Montebello Reservoir. The State did not suggest that he continually looked over his shoulders as though he were nervous. There was no evidence that the Defendant being at Lake Montebello wearing gray shorts and a tee shirt was particularly unusual considering that Lake Montebello reservoir has a paved road encircling it; and is often used by the public for exercise. There was no evidence linking the Defendant to Mr. Blue's known drug activity from June 29, 2011. No prior surveillances involving the Defendant. No prior interaction be-

---

**3.** Both orally on the record and in its written memorandum and order denying the State's motion for reconsideration, the circuit court held that "the firearm" would be suppressed. However, at oral argument both parties agreed that a firearm was never recovered. Thus, we shall interpret the Circuit Court's order as suppressing any testimony regarding the detectives' observations of the firearm immediately after the stop.

tween the Defendant and Mr. Blue or exchange of illegal objects for currency between them. The Court believes that the Detectives stopped the vehicle to identify the Defendant and to look for drugs, but did so without reasonable suspicion or probable cause.

When discussing suppression of observations of the firearm, the Court stated:

Here, the length of time between the police stop and resulting activity which the State wishes to admit happened in a matter of minutes according to the Detectives [sic] testimony. This Court finds that, like in *Ferguson*, the events were too close in proximity to purge the taint. This Court also finds that the police misconduct was purposeful. As stated above, the Court believes that the Detectives stopped the Defendant's vehicle as a pretext, but lacked probable cause. The Court does not believe there was an intervening factor which displayed the defendant's ability to carefully consider his options to exercise free will. As stated above, the police stop and resulting events were one sequence which happened in a matter of minutes.

### Questions Presented

As phrased by the State, the following questions are presented for our review:

1. Did the lower court err in deciding that detectives lacked reasonable suspicion to stop Holt after he rendezvoused with an active heroin dealer at a public park, where the two men had a short private meeting in Holt's vehicle and promptly parted ways, after the dealer had gone out of his way to collect a small package just before the meeting and behaved the same as he had when he was seen delivering heroin two weeks earlier?

2. Even assuming *arguendo* that the stop was unlawful, did the circuit court err in suppressing testimony of Holt's new distinct crimes, where when ordered to show his hands Holt pointed a firearm at a detective and accelerated his vehicle toward him?

## Standard of Review

Our review of a circuit court's ruling on a motion to suppress is limited exclusively to facts and information contained in the record of the suppression hearing. *Smith v. State*, 414 Md. 357, 361, 995 A.2d 685 (2010). We must accept the circuit court's factual findings unless clearly erroneous. *Id.* However, we undertake our own independent constitutional analysis by reviewing the law and applying it to the facts of the case. *Id.*

## Discussion

The State contends that the circuit court erred in determining that appellee was seized unlawfully in violation of the Fourth Amendment's guarantee against unreasonable searches and seizures. We hold that the stop of appellee's vehicle on July 13, 2011 was supported by articulable reasonable suspicion, as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and therefore reverse the circuit court's decision to suppress any testimony regarding any of the detectives' observations of the firearm subsequent to the stop. In addition, assuming the stop was not supported by articulable reasonable suspicion, any new crimes committed by appellee immediately following the stop, such as possessing, raising and pointing the firearm at Detective McShane and accelerating his vehicle towards Detective McShane, purged the taint from the unlawful stop; therefore, the exclusionary rule does not apply.

### 1. Reasonable Suspicion

First, the State argues that there was reasonable articulable suspicion for the detectives to conduct an investigatory stop of appellee on July 13, 2011. The State recites facts that, when considered under a totality of the circumstances, establish reasonable suspicion: "(1) the active narcotics trade of Daniel Blue, the individual with whom Holt met; (2) the actions taken by Blue immediately before coming to meet with Holt; (3) the peculiar nature of the meeting itself; (4) Blue's nervous behavior throughout his encounter with Holt; and (5) addition-

al similarities between the Blue–Townsend drug transaction on June 29 and the Blue–Holt meeting on July 13." Further, the State argues that the circuit court applied the wrong standard when determining whether the detectives objectively possessed reasonable suspicion. In response, appellee notes that most of the evidence was "solely attributable to Daniel Blue," not appellee, and that a person simply consorting with a criminal is not enough to support a reasonable suspicion that the person is engaging in criminal behavior.

 The Fourth Amendment protects citizens against unreasonable searches and seizures by the government. It applies to the states through the due process clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The detention of a motorist by a law enforcement officer is considered a "seizure" under the Fourth Amendment. *Cartnail v. State*, 359 Md. 272, 283–284, 753 A.2d 519 (2000). Generally, if a seizure occurs without probable cause, it violates the Fourth Amendment. However, in *Terry v. Ohio*, the Supreme Court held that a law enforcement officer can conduct a brief investigative "stop" of a person if that officer has a reasonable suspicion that criminal activity is afoot. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The officer may detain that person briefly only in order to investigate the circumstances that provoked suspicion. *Nathan v. State*, 370 Md. 648, 805 A.2d 1086 (2002).

 Reasonable suspicion is more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. Instead, there must be "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* at 21, 88 S.Ct. 1868. Reasonable suspicion is a significantly less demanding standard than probable cause or preponderance of the evidence and merely "requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). It is a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and

prudent people act." *Stokes v. State,* 362 Md. 407, 416, 765 A.2d 612 (2001).

The court must analyze the totality of the circumstances to determine objectively whether the officer possessed reasonable suspicion. *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The officer's subjective state of mind or intent has no relevance to a reasonable suspicion determination. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). A string of otherwise innocent behavior may, when analyzed together as part of the totality of the circumstances, constitute reasonable suspicion. *United States v. Arvizu,* 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The court should not "parse out each individual circumstance for separate consideration." *Ransome v. State,* 373 Md. 99, 104, 816 A.2d 901 (2003). In analyzing reasonable suspicion, the court must allow law enforcement officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Id.* at 273, 816 A.2d 901.

Here, based on a totality of the circumstances, the detectives possessed reasonable articulable suspicion that appellee had just engaged in a narcotics transaction in order to conduct a brief investigatory stop. The detectives knew that appellee met in a public location with a known drug dealer, Mr. Blue, in what appeared to be a prearranged meeting. The detectives knew that Mr. Blue entered appellee's car, and the two drove around Lake Montebello once before quickly parting ways. The detectives knew that neither party worked out at the exercise station while at Lake Montebello. The detectives knew that neither party went to a location to have lunch while at the lake.

The detectives knew that Mr. Blue just traveled from the North Avenue courthouse to Baltimore County to pick up a small container and then drove to Lake Montebello, 1.7 miles away from where he started. The detectives noticed that Mr.

Blue was looking rapidly around, just as he had at a confirmed narcotics transaction only a few weeks prior. The detectives also knew that Mr. Blue had not looked rapidly around while visiting the North Avenue courthouse. *See Bost v. State,* 406 Md. 341, 358, 958 A.2d 356 (2008) *quoting Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). Although appellee suggests that Mr. Blue may have been looking around in order to locate appellee, the record reflects that Mr. Blue continued to look around after meeting with appellee and during their brief conversation.

Finally, the detectives were familiar with a previous confirmed narcotics transaction in which Mr. Blue participated. The detectives knew that the previous transaction also took place in a seemingly prearranged public location where the parties arrived separately and parted ways quickly after meeting.

To counter these facts, appellee asserts that appellee's actions were entirely innocent and were not probative of criminal activity. Appellee also asserts that we should not impute any of the circumstances surrounding Mr. Blue to appellee. In so arguing, appellee focuses on a number of cases in which the courts analyzed whether reasonable suspicion existed to support an investigative stop where the stop was based on a tip or report about a previous crime. *See, e.g., Stokes v. State,* 362 Md. 407, 765 A.2d 612 (2001); *Cartnail v. State,* 359 Md. 272, 753 A.2d 519 (2000); *Hardy v. State,* 121 Md.App. 345, 709 A.2d 168 (1998). However, more relevant in this case are cases that focus on when reasonable suspicion arises based on an officer's personal observations of a defendant's behavior. We shall discuss several cases in turn.

▉ First, appellee cites *Cartnail* for the proposition that "it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage." 359 Md. at 291, 753 A.2d 519. *See also Bost v.*

*State,* 406 Md. 341, 357, 958 A.2d 356 (2008) *quoting Ferris v. State,* 355 Md. 356, 391–92, 735 A.2d 491 (1999) ("It does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her."). However, "[a] factor that, by itself may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome,* 373 Md. at 105, 816 A.2d 901. *See Arvizu,* 534 U.S. at 274, 122 S.Ct. 744 ("The court appeared to believe that each of [the agent's] observations that was by itself susceptible to an innocent explanation was entitled to no weight. *Terry,* however, precludes this sort of divide-and-conquer analysis.").

There are several Maryland cases which focus on whether and when reasonable suspicion arises based on an officer's personal observations of a defendant's seemingly innocent behavior. In *Crosby v. State,* the Court of Appeals found that law enforcement did not have sufficient reasonable suspicion to stop the defendant's car based on the following behavior: driving in a high-crime area at night a few days after a homicide occurred in the area, the driver slumping down in his seat either before or after spotting law enforcement, driving in a peculiar, although entirely legal, manner, and the fact that defendant's car was not registered to an address in the immediate area. 408 Md. 490, 970 A.2d 894 (2009). The Court reasoned that

> the combination of factors, viewed in their totality, are no more indicative of criminal activity than any one factor assessed individually. [The officer] testified only that he considered what he observed to be suspicious; he did not illuminate how his training and experience caused him to believe that what he observed revealed possible criminal activity.

*Id.* at 511, 970 A.2d 894. *See also Ransome v. State,* 373 Md. 99, 816 A.2d 901 (2003) (holding that law enforcement did not have sufficient reasonable suspicion to either stop or frisk the defendant when the defendant was in a high-crime area, had a large bulge in his pants pocket, and acted nervously when approached by officers).

Contrary to *Crosby* and *Ransome*, in *Graham v. State*, the Court of Appeals found reasonable suspicion to support an investigatory stop where the defendant was carrying a cardboard box with "computer-type" equipment protruding from the top, the defendant's companion began walking quickly away once he spotted law enforcement, and both suspects made contradictory statements regarding ownership or knowledge of the box before law enforcement officers said a word. 325 Md. 398, 601 A.2d 131 (1992). *See also Bost*, 406 Md. at 358, 958 A.2d 356 (finding reasonable suspicion where the defendant was in a known drug trafficking area, fled when approached by police, and continuously clutched at his waistband).

Outside of Maryland, there are two federal cases that are particularly relevant. In *United States v. McCoy*, a police officer witnessed a series of otherwise innocent behaviors which, based on a totality of the circumstances, supported reasonable suspicion to detain and frisk the defendant. In that case, an experienced police officer was conducting surveillance in a grocery store parking lot, where, he testified, many illegal drug transactions in the area occurred. 513 F.3d 405, 407 (4th Cir.2008). The officer saw a truck park in front of the defendant's car and overheard the truck driver and the defendant discuss where to meet. *Id.* at 408. The officer then observed both vehicles leave the parking lot and drive to another grocery store parking lot. *Id.* The defendant then entered the truck, spoke with the driver, and exited the truck after about a minute. *Id.* The truck driver then began to drive away. *Id.* In that case, the district court suppressed the fruits of the seizure, noting that the officer did not hear the entirety of the defendant's conversation with the driver, did not observe a hand-to-hand drug transaction, and did not have any knowledge that either party was involved with drugs. *Id.* at 412. The Fourth Circuit reversed, noting that the district court erred in emphasizing what "factual circumstances did not exist" and in considering "the 'innocent' facts here without considering how an experienced police officer might approach the same factual circumstances." *Id.* at 413.

In *United States v. Dubose*, a law enforcement officer witnessed a defendant approach and lean into the front driver's side of a car "with both hands and his upper torso inside the vehicle." 579 F.3d 117, 119 (1st Cir.2009). A few moments later the defendant turned around and walked back the way he came. *Id.* The First Circuit affirmed the district court's denial of a motion to suppress evidence resulting from the defendant's subsequent seizure, reasoning that the law enforcement officer had a sufficient reasonable suspicion that the defendant had engaged in a drug transaction because of the defendant's conduct and the fact that the whole encounter was "similar to the conduct involved in other drug transactions in the area." *Id.* at 121.

Appellee argues that the detectives here did not know as much as the law enforcement officers in *McCoy* or *Dubose*, and what they did know added up to entirely innocent conduct. Admittedly, there is much that the detectives did not know on July 13th and did not testify to at the suppression hearing. Unlike in *McCoy* and *Dubose*, there was no evidence that Lake Montebello was commonly used for drug deals or that the detectives had previously observed similar transactions at Lake Montebello. There was no evidence that drug dealers in Baltimore commonly carry narcotics in tupperware containers. There was no evidence that Mr. Blue actually handed the tupperware container to appellee. However, these types of circumstances are not necessarily required in order to find reasonable suspicion in a narcotics case. Evidence of a high crime area or similar conduct occurring during similar crimes may be used to support an inference that a drug transaction had occurred. The totality of the circumstances is what controls, however, in light of how an experienced police officer might objectively view the circumstances.

Unlike in *Crosby*, Detective Crystal testified at the suppression hearing that based on his training and experience, he believed that Mr. Blue and appellee had just engaged in a drug transaction. Similar to *Graham* or *Dubose*, appellee never engaged in any overtly criminal activity, but taken together, all of the circumstances of which the detectives were

aware combined to create a reasonable suspicion. Similar to *McCoy*, the peculiar nature of briefly meeting in one place and not engaging in activities for which that location is designed, although each fact parsed out is seemingly innocent, combined with other information known to the detectives about one of the parties, gave rise to a reasonable suspicion.

This case highlights the importance of not focusing on any set list of facts that must be present for reasonable suspicion to exist, but rather to examine the totality of the circumstances to determine whether an officer could reasonably suspect that criminal activity is afoot. The fact that the detectives did not witness any overtly criminal behavior by either Mr. Blue or appellee during their meeting does not make it impossible for the detectives to possess a reasonable suspicion. If the question were whether the detectives possessed probable cause in this case, the answer would be no. Reasonable suspicion is a lower standard, however, and one for which courts should be loath to assign specific requirements.

Appellee also contends that we should not consider any of Mr. Blue's conduct prior to and on July 13th in determining whether the officers possessed reasonable suspicion to stop appellee. Both parties agree that reasonable suspicion cannot be found where the only evidence is that a defendant simply interacted with a known criminal. *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). *See also Gibbs v. State*, 18 Md.App. 230, 306 A.2d 587 (1973) (finding no reasonable suspicion to justify a brief investigatory stop where a law enforcement officer saw the defendant associating with known drug users on the sidewalk in a high-crime area.). Nevertheless, there are several cases inside and outside Maryland where the fact that the defendant consorted with a known criminal is considered as a factor, among other circumstances, to support a reasonable suspicion that the defendant was engaged in criminal activity. For example, in *In re David S.*, an officer observed the defendant with a known drug dealer and saw him disappear behind an abandoned building while the drug dealer stood out front. 135 Md.App. 363, 366, 762

A.2d 970 (2000) *aff'd by In re David S.,* 367 Md. 523, 789 A.2d 607 (2002). The defendant came back to the drug dealer, pulled something out of his pocket, showed it to the drug dealer, and then put it in the waistband of his pants. *Id.* We determined that those circumstances created a sufficient reasonable suspicion to justify a brief investigatory *Terry* stop, but did not support a *Terry* frisk. *Id.* at 368–69, 762 A.2d 970.

In *United States v. Bailey,* an officer was working undercover when he attempted to make a purchase of cocaine from a drug dealer. 622 F.3d 1 (D.C.Cir.2010). While waiting to complete the purchase, the officer saw the defendant go into the alley behind the drug dealer's restaurant. *Id.* at 3. Shortly thereafter, the drug dealer's supplier drove his car into the alley behind the drug dealer's restaurant, stopping by a storage shed where the officer had previously bought drugs from the drug dealer. *Id.* Thirty seconds later, the defendant drove his car into the alley and parked it parallel to the drug supplier's car. *Id.* A few minutes later, the supplier drove out of the alley and the officer made his drug purchase from the drug dealer. *Id.* Shortly thereafter, the defendant was stopped by another officer. *Id.* The D.C. Circuit held that the officer had a reasonable suspicion that the defendant was engaged in criminal activity because the officers "observed and recorded [the defendant] and [the drug dealer] talking and walking together at the time and place [the drug dealer] was arranging to sell drugs to [the] undercover officer." *Id.* at 7. *See also Bolton v. Taylor,* 367 F.3d 5 (1st Cir.2004) (finding reasonable suspicion, sufficient to invalidate the plaintiff's 42 U.S.C. § 1983 claim against the police officer, where an officer witnessed a known prostitute and drug addict exit the plaintiff's car and give the officer a mischievous smile, and after which the plaintiff left the parking lot with squealing tires and a high rate of speed).

██ Appellee's argument that the court should not "impute circumstances surrounding Mr. Blue to appellee" is without merit. A person may not be reasonably suspected of criminal behavior based solely on the person's association with

a known criminal, but the fact that a person does associate with a known criminal can be taken into account as part of the totality of the circumstances in determining the existence of reasonable suspicion.

Here, the court should have considered all of the circumstances, in light of the detectives' training, experience, and observations. Similar to *David S., Bailey,* or *Bolton,* the circumstances were sufficient to support reasonable suspicion to support a brief investigatory stop. Questions relating to probable cause and a *Terry* frisk are not before us. Appellee makes the valid point that more evidence was present in *Bailey* or *Bolton* than present here, but both cases support the notion that consorting with a known criminal, combined with other acts, can give rise to reasonable suspicion.

Narcotics transactions typically require both a buyer and a seller; thus, one party's suspicious actions, when coupled with a defendant about whom less is known, should be considered when determining if law enforcement possessed a reasonable suspicion that a defendant engaged in a narcotics transaction. As the State in its brief aptly noted, to take into consideration the fact that the defendant is consorting with a known narcotics dealer, "is not to transfer a detective's knowledge of one participant's guilt to a new associate, but rather to include the detective's information about an active narcotics dealer as one relevant factor in gauging whether there is a valid basis for suspecting a counterparty's involvement in current criminal activities."

In deciding a motion to suppress, a trial court should focus on the totality of the circumstances and analyze what facts are before it rather than focus on what facts are missing. Just because there may be innocent explanations for each aspect of a defendant's conduct, standing alone, does not necessarily mean that it is impossible for an officer with training and experience in the field to form an objectively reasonable articulable suspicion that the defendant is engaged in criminal activity, based on a totality of the circumstances. For the above reasons, we conclude that there was reasonable

suspicion to believe that appellee was engaged in criminal activity, and therefore, we must reverse.

## 2. *Exclusionary Rule*

■ Assuming the detectives did not possess reasonable suspicion when effecting the investigatory stop of appellee's vehicle, testimony regarding the detective's observations of the firearm should not be suppressed under the exclusionary rule. Appellee's actions of raising and pointing the firearm were an intervening act, born out of appellee's free will, which sufficiently attenuated any potential taint from the investigatory stop.

■ Generally, the exclusionary rule prohibits any illegally obtained evidence to be used against a defendant at trial. The Supreme Court first created the exclusionary rule as a way of ensuring that law enforcement officers respect the constitutional rights of citizens and also of ensuring judicial integrity. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The Supreme Court later held that the exclusionary rule applies not only to evidence originally obtained in an illegal search or seizure, but also all evidence derived from that illegal search or seizure as it is the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun,* the Court explained that although such "derivative evidence" is generally inadmissible, some derivative evidence can be introduced if "the evidence to which instant objection is made has been come [sic] at by ... means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotation omitted).

■ In determining whether derivative evidence is purged of the primary taint, it is not enough for a court to examine whether "but for the illegal actions of the police" the evidence would have been discovered. *Cox v. State,* 421 Md. 630, 652, 28 A.3d 687 (2010) (internal citations omitted). Instead, there are three ways to "purge the taint" of the original illegality. The Court of Appeals explained these three methods in *Miles v. State,* 365 Md. 488, 520–21, 781 A.2d 787 (2001):

First, evidence obtained after initial unlawful governmental activity will be purged of its taint if it was inevitable that the police would have discovered the evidence. Second, the taint will be purged upon a showing that the evidence was derived from an independent source. The third exception ... will allow the use of evidence where it can be shown that the so-called poison of the unlawful governmental conduct is so attenuated from the evidence as to purge any taint resulting from said conduct.

(internal citations omitted). In this case, the third exception is the most relevant.

■ From the Supreme Court's decision in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), Maryland adopted three factors in determining attenuation. *See Ferguson v. State*, 301 Md. 542, 549, 483 A.2d 1255 (1984). Such an analysis involves a balancing test, and no single factor is dispositive. *Cox v. State*, 421 Md. 630, 653, 28 A.3d 687 (2011). Those three factors are: 1) the temporal proximity between the actual illegality and the evidence the defendant seeks to be suppressed; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct.

### A. Temporal Proximity

■ In the case before us, the temporal proximity factor is neither dispositive nor very relevant. As was noted noted in *Ferguson:*

Although this factor intimates that the likelihood that the taint has been purged increases in proportion to the time that has elapsed between the unlawful conduct and the evidence derived therefrom, the Supreme Court has understandably not articulated any mathematically precise test for determining at what point the taint has been purged by the lapse of time ... Because a lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention, the temporal proximity factor has been labeled 'ambiguous,' and 'relatively unimportant.'

301 Md. at 550, 483 A.2d 1255 (internal citations omitted). Although appellee emphasizes that the events in question took place rapidly after the officers pulled over appellee's car, as appellant notes, typically temporal proximity is used to "gauge the voluntariness of a suspect's confession or a witness' statement to police." *See, e.g., Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and *Ferguson v. State,* 301 Md. 542, 483 A.2d 1255 (1984). Here, analyzing temporal proximity does not shed any more light on the voluntariness of appellee's behavior than simply analyzing the behavior itself, which leads us to the second prong.

### B. Intervening Circumstances

The second factor is the presence of intervening circumstances. An intervening circumstance is any event that "breaks the causal connection between the unlawful conduct and the derivative evidence." *Ferguson,* 301 Md. at 551, 483 A.2d 1255. The focus should be "on the accused to determine whether there was any event that contributed to his ability to consider carefully and objectively his options and to exercise his free will." *Id.* It appears that Maryland has not had a chance to weigh in on whether a new crime committed by a defendant after an illegal search or seizure is a sufficient intervening circumstance that can attenuate the taint of an illegal search or seizure. Nevertheless, a number of state and federal courts have held that a new, distinct crime by a defendant should not be suppressed due to an earlier Fourth Amendment violation, either because it is an intervening act free of the initial taint or it is sufficiently attenuated from the taint.[4]

---

4. *See, e.g., United States v. King,* 724 F.2d 253 (1st Cir.1984); *United States v. Remington,* 208 F.2d 567 (2d Cir.1953); *United States v. Nooks,* 446 F.2d 1283 (5th Cir.1971); *United States v. Dawdy,* 46 F.3d 1427 (8th Cir.1995); *United States v. Udey,* 748 F.2d 1231 (8th Cir.1984); *United States v. Garcia,* 516 F.2d 318 (9th Cir.1975); *United States v. Crump,* 62 F.Supp.2d 560 (D.Conn.1999); *United States v. Bellamy,* 592 F.Supp.2d 308 (E.D.N.Y.2009); *United States v. Colon,* 654 F.Supp.2d 326 (E.D.Pa.2009); *People v. Smith,* 870 P.2d 617 (Colo.Ct.App.1994);

The seminal case in this area comes out of the Eleventh Circuit Court of Appeals. In *United States v. Bailey*, DEA agents were taking a defendant suspected of smuggling narcotics to a private area of an airport when he fled, struck the agent escorting him, and attempted to grab the agent's firearm. 691 F.2d 1009, 1012 (11th Cir.1983). The agent eventually arrested the defendant. *Id.* During the subsequent search, the agent recovered substantial amounts of cocaine and heroin. *Id.* The Eleventh Circuit assumed that the arrest was illegal, but explained that "notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." *Id.* at 1016–1017. The Court explained that "a contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id.* at 1017. Extending the exclusionary rule to suppress evidence of new crimes "gives a defendant an intolerable *carte blanche* to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct." *Id.* (emphasis in original).

The Fourth Circuit has also held that the commission of a new crime purges the taint of an unlawful search or seizure. In *United States v. Sprinkle*, law enforcement officers effected an unlawful vehicle stop and the defendant ran from the police, pulled a gun, and fired at them. 106 F.3d 613 (4th Cir.1997). The defendant was charged with being a felon in possession of a firearm. At trial, the defendant filed a motion to suppress the gun on the grounds that it was seized illegally due to a lack of reasonable suspicion for the stop. *Id.* at 616.

---

*People v. Klimek,* 101 Ill.App.3d 1, 56 Ill.Dec. 403, 427 N.E.2d 598 (Ill.App.Ct.2d Dist.1981); *Commonwealth v. Saia,* 372 Mass. 53, 360 N.E.2d 329 (1977); *State v. Bale,* 267 N.W.2d 730 (Minn.1978); *State v. Courville,* 313 Mont. 218, 61 P.3d 749 (2002); *People v. Townes,* 41 N.Y.2d 97, 390 N.Y.S.2d 893, 359 N.E.2d 402 (1976); *State v. Miller,* 282 N.C. 633, 194 S.E.2d 353 (1973); *State v. Indvik,* 382 N.W.2d 623 (N.D.1986); *State v. Burger,* 55 Or.App. 712, 639 P.2d 706 (1982); *State v. Miskimins,* 435 N.W.2d 217 (S.D.1989).

The Fourth Circuit held that the officers did lack reasonable suspicion for the stop, but that the defendant committed a new crime when he pointed the gun and fired at the officers, and thus, the seizure of the gun was lawful and admissible. *Id.* at 619–620. The Circuit reasoned that "a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest." *Id.* at 619.

Thus, in Maryland, we now hold that a new crime, even if causally linked to illegal activity on behalf of law enforcement, is an intervening circumstance that attenuates the taint from that illegal activity. Evidence of the new crime should not be suppressed. This conclusion is supported by the fact that, in Maryland, a suspect has no right to resist an illegal stop or frisk. *See Barnhard v. State,* 86 Md.App. 518, 587 A.2d 561 (1991) *aff'd by Barnhard v. State,* 325 Md. 602, 602 A.2d 701 (1992) (illegal stop); *State v. Blackman,* 94 Md.App. 284, 617 A.2d 619 (1992) (illegal frisk). *See also Leatherberry v. State,* 4 Md.App. 300, 304, 242 A.2d 599 (1968) ("whether the officer's action in this case was proper . . . appellant's subsequent action in assaulting the officer was clearly unlawful and justified the subsequent arrest.").

Here, the evidence concerning the firearm potentially affects four crimes with which the defendant is charged: assault, use of a handgun in the commission of a crime of violence, reckless endangerment, and felon in possession of a handgun. Appellee's criminal acts of assault, reckless endangerment, and use of a firearm in the commission of a crime of violence, if proved, are sufficiently attenuated from any potential taint from the stop. The circuit court accepted the basic position that a defendant's unlawful assault on law enforcement officers purges the taint of an illegal stop. Thus, the circuit court reasoned that the detective's testimony about appellee's alleged assault of Detective McShane by his vehicle would not be suppressed. However, the circuit court erroneously distinguished that assault from appellee's assault of Detective McShane by firearm, reasoning that appellee's assault by firearm was not born out of his own free will because

it was a direct response to the police directive to raise his hands. Even if that could be a valid reason, in the abstract, the conclusion is contrary to the record. According to Detective Crystal's testimony and written statement, and the circuit court's findings of fact, appellee's hands were already resting on the steering wheel when Detective McShane commanded him to show his hands. Therefore, if appellee was simply responding to Detective McShane's directive, there would have been no reason for appellee to lower his right hand out of sight, quickly raise it, and point a handgun at Detective McShane, as Detective Crystal noted. There is no relevant difference between the assault by vehicle and the assault by firearm. Pointing the firearm constituted a new crime which was sufficiently attenuated from the detectives' previous actions. A charge of the use of a firearm in the commission of a crime of violence also goes hand in hand with a charge for assault based on the pointing of the firearm. Thus, for the purposes of proving assault, reckless endangerment, and use of a firearm in the commission of a crime of violence, the detectives' testimony about appellee pointing that firearm at Detective McShane is testimony about new criminal acts that are sufficiently attenuated from the illegal stop.

In addition to assault and the use of a firearm in the commission of a crime of violence, appellee was also charged with being a felon in possession of a firearm under Maryland Code (2012 Repl.Vol.) § 5–622 of the Criminal Law Article. The evidence the State would use to prove this charge is essentially identical to the evidence of the assault and use of a firearm in the commission of a crime of violence; however, it is a very different crime. The fact that appellee was a felon who possessed a firearm was not a new crime that he committed after the *Terry* stop. Instead, appellee's actions following the *Terry* stop merely revealed this preexisting crime. For example, in *United States v. Beck,* the defendant tossed a marijuana cigarette and narcotics paraphernalia out of the window of his parked car after he had been illegally stopped by the police. 602 F.2d 726 (5th Cir.1979). This abandoned property gave the officer probable cause to arrest Beck and

search his car. *Id.* at 728. Nevertheless, the former Fifth Circuit suppressed all of the resulting evidence as fruit of the initial unlawful stop, reasoning that "the abandoned contraband was itself the product of unlawful action" and that "it would be sheer fiction to presume ... [the act of abandonment] were caused by anything other than the illegal stop." *Id.* at 728–730.

The Eleventh Circuit in *Bailey* distinguished *Beck* by stating that

[I]n *Beck* the defendant's *response* to the illegal police conduct (*i.e., tossing* the marijuana out of the car window) was not itself a new, distinct crime. The defendant in Beck was in possession of the marijuana before the police misconduct occurred and his response to the misconduct only revealed this extant crime and did not itself constitute a crime—*i.e.,* tossing the marijuana is not a crime, possessing it is. If a noncriminal act that merely *reveals* a crime that has been or is being committed by the time of the official misconduct constituted the basis for an exception to the fruits doctrine, then [Beck] would have been resolved differently.

691 F.2d at 1017 (emphasis in original).

The Fourth Circuit has adopted similar reasoning for possession crimes. In *United States v. Gaines,* 668 F.3d 170 (4th Cir.2012), the Court distinguished the case from its earlier holding in *Sprinkle.* In *Gaines,* the officers illegally stopped the defendant. *Id.* at 171. During a subsequent illegal patdown of the defendant, one of the officers discovered a handgun. *Id.* The defendant then assaulted the two police officers. *Id.* The defendant was indicted on one count of possession of a firearm by a convicted felon. *Id.* Prior to trial, the defendant moved to suppress the firearm because the stop and search of his person violated the Fourth Amendment. *Id.* The Government argued that, pursuant to *Sprinkle,* the taint of the unlawful stop was purged when defendant assaulted the officers. *Id.* at 174. However, the Fourth Circuit distinguished *Sprinkle* by noting that the firearm in that case "was only

discovered after the defendant engaged in illegal activity subsequent to an earlier unlawful stop." *Id.* In *Gaines,* the discovery of the firearm took place before the defendant's subsequent criminal conduct; therefore, the subsequent criminal conduct could not constitute an intervening event for purposes of suppressing the firearm. *Id.*

Here, similar to *Sprinkle,* appellee's firearm was discovered by officers at the same moment of the intervening criminal conduct that purged the taint from any illegal stop. Unlike in *Beck,* it was not innocent conduct which revealed appellees' possession of the firearm, but instead criminal conduct. Unlike in *Gaines,* the officers did not discover the firearm before appellee's criminal activity, but rather discovered it at the same time. At that point, appellee's subsequent criminal actions, including the possession of a firearm, were sufficiently attenuated from the allegedly illegal stop.[5] The detectives did not learn about the gun through the stop, but rather through appellee's subsequent criminal actions. Thus, testimony about the firearm can be introduced for all three charges.

### C. *Purposeful or Flagrant Misconduct*

Finally, the third prong examines whether the official misconduct was purposeful and flagrant. Examples of purposeful or flagrant misconduct are dragnet operations or pretextual arrests. *See Ferguson,* 301 Md. at 552, 483 A.2d 1255.

Here, appellee emphasizes that the circuit court found that the police misconduct was purposeful and that the detectives stopped the vehicle as a pretext. The circuit court determined that the stop was pretextual because the detectives mentioned the traffic stop for the first time at the motions hearing, and

---

5. We pause to note hypothetically that, if Detective Crystal had seen the firearm in appellee's car prior to appellee's actions of raising and pointing the firearm at Detective McShane, and we found no reasonable suspicion for the stop, testimony regarding appellee's possession of the handgun would be suppressed as an instance of "fruit of the poisonous tree." If that were the case here, before trial, defense counsel could move to dismiss the felon-in-possession charge under Maryland Rule 4–252(d) based on lack of evidence, leaving the assault and use of a handgun charge to stand for trial.

the circuit court did not find that explanation credible. First, we note that, had there been a valid traffic stop, the stop would not have been unlawful even if pretextual in the sense that the officers' had other subjective motives. The misconduct here, given the court's factual findings, was the untruthful statements that appellant had violated a stop sign law. That misconduct occurred after the stop, but even if we assume that the detectives, at the time of the stop, intended to later make that false statement, misconduct that occurs while effecting the stop does not necessarily require a court to apply the exclusionary rule. As noted above, the *Brown* factors are used as a balancing test, and in this situation, the detectives' misconduct does not outweigh the strong intervening circumstance of appellee brandishing a firearm towards an officer, even if that officer did engage in some misconduct.

For the above reasons, we reverse and remand to the circuit court for further proceedings consistent with this opinion.

**ORDER OF SUPPRESSION BY CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**